Land Title Bank and Trust Company, Appellant,
*v.* Baron et al.

Argued January 7, 1941. Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, PATTERSON and PARKER,
JJ.

242

*Thomas Raeburn White,* with him *Thomas Raeburn White, Jr.,* and *White & Staples,* for appellant.

*John Randolph Young,* with him *Andrew R. McCown* and *Shields, Clark, Brown & McCown,* for appellee.

OPINION BY MR. JUSTICE PATTERSON, March 24, 1941:

This appeal is from a decree, entered by the court below in a proceeding instituted by a bill in equity to foreclose a mortgage, directing the subordination of certain guaranteed bonds, comprising part of a series the mortgage was given to secure, which were pledged with the indenture trustee as collateral security for loans made by it to the guarantor, the fund realized from the sale of the mortgaged premises being insufficient to pay all bonds in full.

Frank Seitchik, appellee, is the holder of two Class "A" participating bonds secured by a mortgage upon the land and buildings known as the Fairfield Apartments, located at 53rd Street and Wynnefield Avenue, in Philadelphia. The bonds, which were payable June 15, 1929, were executed on June 15, 1926, by one S. Louis Baron, who held title to the premises as "straw man" for the real owner. There were two series: Class "A" having a preferential status, comprising 175 bonds of a face value of $175,000, and Class "B," having a deferred status, consisting of 25 bonds with a face value

of $25,000.· The Class "B" bonds are not involved in this proceeding. The bonds and mortgage were delivered to the Real Estate Land Title and Trust Company (now the Land Title Bank and Trust Company), appellant, as trustee for the bondholders. Payment of principal and interest on the bonds was guaranteed by the Philadelphia Company for Guaranteeing Mortgages (hereinafter referred to as guarantor), which company purchased the Class "A" bonds and resold them to the general public. By the terms of the guarantee, the individual bondholders were to make no demand upon the mortgagor except through the guarantor, and no extension was to be granted without its consent. In accordance with its usual practice, the guarantor maintained a ready market for the bonds, which were assignable, but not negotiable.

The guarantor, on June 5, 1929, notified the bondholders that the owner of the mortgaged premises had requested an indefinite extension of the loan, and that all who desired to retain their bonds would continue to receive guaranteed interest thereon, while those who so desired might deposit their certificates with the guarantor and receive payment. No formal extension of the mortgage was granted. On June 15, 1929, the mortgagor defaulted upon the principal, and on and after December 15, 1929, the interest on the Class "A" bonds was defaulted. The guarantor, however, continued to pay the interest to and including the installment due December 15, 1932. Shortly after the default in payment of the principal, the owner of the mortgaged premises surrendered its leases to appellant, as trustee. Formal demand for payment was made by appellant upon the mortgagor, on March 20, 1930, and on the same day notice of the demand was given the guarantor. Appellant took possession of the property on April 12, 1930.

From June, 1929, to October 6, 1931, the guarantor repurchased, and registered in its own name, Class "A" bonds of a total value of $71,000. On the latter date,

these bonds were pledged to appellant, in its separate corporate capacity, to secure direct loans previously made by it to the guarantor, in the sum of $967,000, and its liability of $480,000 upon a conditional guarantee of another loan. The guarantor's president testified that he regarded the corporation as solvent on the date of the transfer. On December 15, 1931, however, its financial situation was such that its directors and officers elected to invoke, for the first time, an eighteen months' period of grace upon its obligations of guarantee. Receivers were appointed for the guarantor on January 11, 1933, whereupon the pledged bonds, together with its other assets, were assigned to an operating trustee, the Mortgage Service Company of Philadelphia. At the request of more than 25 per cent of the Class "A" bondholders, appellant, as trustee, on December 3, 1936, instituted foreclosure proceedings in equity, and the mortgaged premises were purchased at sheriff's sale by a bondholders' committee. A net fund of $90,268.49 was realized, which fund is now before the court below for distribution. Appellant's account, as trustee, was confirmed on October 30, 1939, but the court reserved decision upon the status in distribution of the pledged bonds.

Pursuant to a decree of the United States District Court, the pledged securities were, on December 9, 1939, exposed to sale at public auction and were purchased by appellant in its separate corporate capacity. Thereafter, appellant, *as trustee,* filed a petition in the court below, setting forth the contention of certain Class "A" bondholders that these bonds should be subordinated in distribution and submitting the question for determination. Answers were filed by appellant *in its individual corporate capacity,* and by appellee. A hearing was had before the chancellor, which resulted in an adjudication that the bonds should be subordinated. Exceptions filed by appellant were dismissed, and this appeal followed. The court below had previously decreed that

Class "A" bonds, of a value of $9,000, remaining in the hands of the guarantor's operating trustee, and not involved in this appeal, should have a subordinated status.

Appellant's claim to parity in distribution rests upon the assertion that it purchased the bonds for value, by virtue of the pledge, prior to default by the guarantor, and without knowledge of any equities existing in favor of the other bondholders. Appellee contends that at the time of the hypothecation of the bonds, both mortgagor and guarantor were in default, and that appellant then knew or should have known facts indicating that the Class "A" bonds would not ultimately be paid in full. The court below so found, and, if its findings are supported by competent evidence, they are binding upon us and conclusive of the subordinate status of appellant's bonds.

In *Land T. Bk. & Tr. Co., Tr., v. Schenck*, 335 Pa. 419, relied upon by appellant, this Court held that a pledgee for value of participating mortgage bonds, from the guarantor, was entitled to share in the distribution of the trust fund *pari passu* with other bondholders of the same class, notwithstanding that the hypothecation occurred after maturity. The sole question presented in the cases there involved, the facts of which superficially resemble those here presented, was whether the time of transfer affected the status of the bonds in distribution. It was pointed out (p. 432) that "No other reason is advanced to defeat their right to share pro rata in distribution, since it appears that the pledgees had no notice of any facts existing at the time of the pledge, which would give rise to equities in favor of the purchasers of bonds." Certain factors which would give rise to such equities were considered, and it was found that the pledgees had no reason to know of their existence, the Court saying (p. 432) : "They cannot be said to have had knowledge that the bonds would not ultimately be paid by the mortgagor, or that The Philadelphia Company would default upon its contracts of

guarantee at the expiration of the eighteen months' grace period. They cannot be charged with knowledge that the proceeds of the foreclosures of the mortgaged properties would be insufficient to satisfy all the bonds secured thereby." In each of the cases then before us, it was stipulated that the pledgees were unaware of default upon the mortgages.

In the present case there can be no doubt that, at the time of the pledge, appellant knew of the mortgagor's default in payment of principal, interest and taxes. It knew that the real owner of the mortgaged premises had surrendered its leases, had failed to pay taxes, and had not made payments of interest and principal on the mortgage to protect its equity. And, appellant was then in possession of the mortgaged premises, leasing and operating same through its agent. Whether the guarantor was also in default at the time of the pledge turns upon the construction to be placed upon the provisions of its written guarantee.

In Paragraph Second of the guarantee, payment of principal is guaranteed "as soon as collected, but in any event within eighteen months after the same shall have become due under the terms of said bond and mortgage." This is an unqualified promise to pay in the event of default by the mortgagor. However, the contract of guarantee was upon a printed form intended for the guarantee of a simple mortgage to a single mortgagee, which, by deletions and insertions, was attempted to be adapted to the insurance of participating mortgage bonds; as is frequently the case, the result was inartificial. By inadvertence or design, the following clause was not stricken from Paragraph Second of the printed form, although its applicability to the situation is doubtful: ". . . if, with the written consent of Guarantor, payment be not demanded when due, then within eighteen months after *it shall have been demanded by the insured*" the guarantor shall be obligated to pay the principal. The reference, in this clause, to a demand

by the "insured," is patently ambiguous. Appellant contends that, as the individual bondholders could not demand payment from the mortgagor under the terms of the contract of guarantee and indenture of trust, the "demand" contemplated is a demand upon the guarantor. But, as appellee points out, the clause refers to the withholding of a demand for payment "with the written consent of Guarantor." It cannot be assumed, therefore, that the parties intended a demand upon the guarantor for payment, for, in such case its consent would, obviously, be unnecessary.

We cannot, as appellee suggests, strike the clause from the contract merely because it is ambiguous or inept, but we must, if possible, assign to it a meaning consistent with the probable intention of the parties. As it was drawn by a professional guarantor, it is, however, to be construed strictly against the guarantor and in favor of the insured. See *Romano v. Loeb*, 326 Pa. 272; *Hess v. Merion T. & T. Co.*, 317 Pa. 501; *Young v. American Bonding Co.*, 228 Pa. 373. The trustee, as mortgagee, is the "insured" originally named in the contract and, under the terms of the trust indenture, it is to act for the bondholders in making demand upon the mortgagor. It is clear, therefore, that if the clause in question is to have any meaning, that meaning must be that the guarantor's period of grace is to run from the time of demand by the trustee upon the mortgagor for payment. Such demand having been made on March 20, 1930, and the guarantor having been given notification thereof, the period of grace expired on September 20, 1931, and, as the bonds were pledged to appellant October 6, 1931, the guarantor was then in default on its obligation. Even if it be assumed that the "escape" clause contemplated demand upon the guarantor, the notice sent to it by the trustee, containing a copy of the letter to the mortgagor and reciting the defaults upon the mortgage would, in our opinion, be sufficient to constitute such a demand. In either event there was

a default upon the guarantee, of which the appellant was well aware.

It is urged that even though the guarantor had defaulted, the bonds in appellant's hands had not acquired a subordinate status at the time of the transfer, because it was not then apparent that the mortgaged property would realize insufficient proceeds, at sale on foreclosure, to pay all of the Class "A" bonds. It was testified that the last appraisal of the mortgaged premises, prior to the pledge of the bonds, placed its value at $250,000, or $50,000 in excess of the total face value of all the bonds and $75,000 more than the amount of the Class "A" bonds. This contention is unrealistic. It ignores the fact that in addition to principal, interest and taxes were delinquent; that appellant had received a surrender of leases from the owner; and that, as trustee, it was in possession of the premises for more than a year previous to the pledge. It also ignores the fact that real estate of such character and value is unlikely to produce an equivalent sum at forced sale. Manifestly appellant at least had reason to doubt that the property would yield sufficient proceeds on foreclosure fully to satisfy the claims of the Class "A" bondholders.

In attributing to appellant knowledge that the guarantor would be unable to make good its default, the chancellor emphasized the close business relationship existing between the two corporations. While there is nothing in the record to support the court's assertion that the guarantor was "virtually a subsidiary" of appellant, there is ample evidence that appellant, as banker for the guarantor and as its creditor to the extent of more than a million dollars, had cause to know of its precarious financial situation, at the time of the pledge, and reason to doubt its ability to cure its default upon the guarantee of these bonds.

All of the above-recited facts distinguish this situation from those involved in the Schenck case, relied upon by appellant, where the pledgees took the bonds without

knowledge of default by either mortgagor or guarantor. Moreover, whereas in the Schenck case the guarantor was the trustee of the various bond issues, in the present case appellant was the trustee and as such stood in a fiduciary relation to the bondholders. As their trustee, it was bound to exercise the utmost good faith in dealing with them and with the property of the trust; its first obligation was to safeguard their interests. See Restatement of Trusts, Section 170 (1), and Comment (j) thereto. By accepting the pledge of the bonds, it placed itself in an anomalous position, for it thereby became a beneficiary of the trust, of which it was trustee, and, in addition, it occupied the position of banker to the guarantor, and was, in its own right, a substantial creditor of the guarantor. When it now seeks, as a beneficiary, to compete on equal terms with the other trust beneficiaries, its status is not the same as that of the pledgees in the Schenck case, and its good faith must be judged by a higher standard.

Whether appellant actually knew, or should have known, that the guarantor would be unable ultimately to meet its obligation to the bondholders, and whether it knew, or had reason to know, that the mortgaged property would realize an insufficient amount on foreclosure sale, its knowledge, in its dual capacity as banker and trustee, was undoubtedly sufficient to disclose the potential equities existing in the bondholders at the time of the pledge. It knew that the mortgage was in default. It knew that the guarantee was also in default. It knew that if the property brought less than the amount of the Class "A" bonds outstanding upon forced sale, the bonds then in the hands of the guarantor would be subordinate in distribution. Nevertheless, with knowledge of all these facts, it accepted a pledge of such bonds, in order to secure itself upon its individual claims against the guarantor.

The distribution of this fund is a matter calling for the application of equitable principles and, under the

circumstances here presented, we are of opinion that it would be clearly inequitable to permit appellant to compete with the other bondholders in the fund now before the court below for distribution. Equity and good conscience require that the bonds now in appellant's hands be subordinated to those held by appellee and other Class "A" bondholders, as beneficiaries of the trust appellant was paid to administer for their benefit.

Decree affirmed at appellant's cost.