CHEMICAL BANK NEW YORK TRUST COMPANY, Trustee, Mortgagee, Appellant,

v.

STEAMSHIP WESTHAMPTON (formerly Steamship Montauk Point), her engines, boilers, etc., Appellee.

Nos. 9637, 9638.

United States Court of Appeals Fourth Circuit.

Argued Nov. 12, 1964.

Decided April 5, 1965.

Rehearing En Banc Denied May 3, 1966.

William A. Grimes, Baltimore, Md. (Ober, Williams & Grimes, Baltimore, Md., Thatcher, Proffitt, Prizer, Crawley & Wood, Edward C. Kalaidjian, Cravath, Swaine & Moore, John W. Barnum, Robert Rosenman, and John C. Hancock, New York City, on brief), for appellant.

William R. Dorsey, III, Baltimore, Md. (Foley & Grainger, John J. Foley, New York City, David R. Owen, Semmes, Bowen & Semmes, Baltimore, Md., Boal, McQuade & Fitzpatrick, and Arthur M. Boal, Jr., New York City, on brief), for appellee Caltex, etc.

Solomon Kaplan, Baltimore, Md. (Sol C. Berenholtz, Baltimore, Md., on brief), for appellee Seafarers Vacation Plan.

Isaac N. P. Stokes, New York City (Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, New York City, Niles, Barton, Gans & Markell, and Robert H. Williams, Jr., Baltimore, Md., on brief), for trustees in bankruptcy.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

These appeals are from a decree that the first preferred mortgage and indenture dated August 6, 1962, from Seatrade Corporation to Chemical Bank New York Trust Company, is not a preferred mortgage under section 922 of the Ship Mortgage Act of 1920. 41 Stat. 1000 (1920), as amended, 46 U.S.C.A. § 922 (Supp. V, 1964).

Seatrade contracted with Struelcken Shipyard of Hamburg, Germany, during 1961, to convert an aged T–2 tanker into a modern bulk cargo carrier. The tanker involved was the SS. WESTHAMPTON, a vessel documented under the laws of the United States at all times relevant to this case. Seatrade paid the shipyard 30% of the conversion cost and sought to borrow the remainder from the Hamburgische Landesbank Girozentrale, a Hamburg bank. The loan was to be secured by a first preferred mortgage on the WESTHAMPTON. American counsel advised Landesbank that such a mortgage to an alien would be valid only if approved by the American Maritime Administration as required by the Shipping Act, 46 U.S.C.A §§ 808, 835. Furthermore, the bank's counsel pointed out that, even if approved by the Commission, the mortgage would still not be preferred under the terms of the Ship Mortgage Act, 46 U.S.C.A. §§ 911–984, because the proposed mortgagee was an alien. An alternative course was therefore suggested— the debt be secured by a first mortgage in favor of a United States citizen trustee, with a bond for the amount of the loan to be issued to Landesbank. Pursuant to this advice Landesbank requested Chemical Bank New York Trust Company to act as mortgagee and trustee under the trust indenture.

Accordingly, the indenture was executed and the bond issued in New York City on August 6, 1962, the terms of the transaction having been agreed on between Landesbank and Seatrade. The mortgage and indenture were prepared by Landesbank, which does not appear as a party on the face of the papers. The proceeds of the loan, $960,000 (DM 3,-836,000), passed directly from the German bank to the German shipyard. It is conceded that Chemical, the American mortgagee-trustee, undertook no more than nominal duties.

A single bond in the full amount of the indenture was executed and delivered to Landesbank. The president of Seatrade, Manuel Kulukundis, gave Landesbank his personal written guarantee of payment of the bond, and Seatrade gave the bondholder ten promissory notes, each in the amount of an installment of principal and interest.

Landesbank has been at all times the owner of the bond. At the closing it gave Chemical a written warranty that the bond was being purchased as an investment with the intention of holding it until maturity. Landesbank then agreed not to dispose of the bond without the consent of Chemical.

Six months later, on January 2, 1963, Chemical informed Landesbank that Seatrade had defaulted in payments due December 31, 1962. Upon failure of Seatrade to remedy the default, Landesbank instructed Chemical to declare the loan due and to take all steps necessary for the protection of Landesbank's interests On January 14, 1963, Chemical was instructed by the German bank to file the libel which has given rise to this case.

The SS. WESTHAMPTON was sold on March 28, 1963, by order of the District Court to a United States citizen. The sale was confirmed and the net proceeds, $2,551,104.41, were paid into the Registry of the District Court. Chemical's claim to a priority in the proceeds was challenged by objecting creditors on the

ground that the indenture did not create a "preferred mortgage" under the Ship Mortgage Act because the holder of the bond secured by the indenture was not a citizen of the United States. The District Court agreed, basing its decision on the finding that Landesbank was the real mortgagee since it had a considerable measure of potential control over the mortgaged property, the SS. WEST-HAMPTON. The exception set out in 46 U.S.C.A. § 911(5), that:

> "The term 'mortgagee,' in the case of a mortgage involving a trust deed and a bond issue thereunder, means the trustee designated in such deed,"

was held to be inapplicable, the phrase "bond issue" being read by the court to mean a "public bond issue."

We agree with the District Court's conclusion that the mortgage in question is not entitled to the claimed preference, but we arrive at this result by a somewhat different course of reasoning.

## I

The debate below revolved round the meaning of the phrase "bond issue" as used in the Ship Mortgage Act, 46 U.S.C.A. § 911(5). Chemical contended that this phrase referred to the issue of bonds, whether to a single investor or to a larger number. Such a reading would make the citizenship of the bondholder irrelevant under the Ship Mortgage Act. The objectors answered that the meaning of "bond issue" is unclear since it could reasonably be understood to refer only to the distribution of bonds to the general public. To clear up the alleged uncertainty, it has been argued below and in this court that an interpretation should be given the term consistent with the statutory purpose of the Ship Mortgage Act. That purpose is then stated by the objecting creditors to be to permit an American trustee to act for a heterogeneous group of bondholders, some of whom might be aliens, but not to permit evasion of the general policy against for-

eign control. They therefore would limit the reading of section 911(5) to apply to "public" bond issues, with the result that while the Ship Mortgage Act expressly grants a preference to a mortgage held by an American trustee, the objecting creditors read into the statute a qualification—namely, that the bonds issued under such a mortgage shall be held by not less than some unspecified number of holders. This approach was adopted by the District Court.

■ We do not share the court's view that the meaning of the phrase "bond issue" was ambiguous when adopted by Congress in 1920. The minimal ambiguity that allegedly exists today is attributable to events occurring since the passage of the Act. No evidence was offered to show that the phrase had any meaning in 1920 other than its literal one, the issue of a bond or bonds. The supposed ambiguity was imported into the statute by the objectors' contention that the phrase might refer to public issues only. The record affords no support for the proposed distinction between public and private issues. The only testimony as to the meaning of "bond issue" in 1920 was that of several bankers called by the appellants. They all testified that "bond issue" was always understood by the financial community to mean the issue of a single or any number of bonds. While the cogency of this testimony may be arguable,[1] the fact remains that it was the only evidence offered on this point.

The District Court nevertheless found an ambiguity by referring to three post-1920 sources, none of which was addressed to the distinction the objectors are urging in this case. The first authority relied on is the Encyclopedic Dictionary of Business Finance published by Prentice-Hall in 1960. On page 23 that volume defines "bond issue" as "a class of bonds offered to the public at the same time." The second reference is to the testimony of a witness before the Mer-

---

1. Not only were these bankers just at the beginning of their careers in 1920, but there is no indication that any factual situation ever arose which required a decision to be made as to the meaning of the phrase "bond issue."

chant Marine and Fisheries Subcommittee in 1954 when that committee had under consideration a proposed amendment to Title XI of the Merchant Marine Act, which provides for government insurance of ship mortgages. The witness, Rudolph Hecht, chairman of the shipowner's committee that proposed the amendment, seemed to assume that a bond issue would involve the interests of a large number of persons. House Hearing on H.R. 8637, p. 18, 83d Cong., 2d Sess. (1954). Thirdly, the following dictum was cited:

> "In placing ship mortgages upon a stronger basis as securities, the Congress had in mind, and expressly included, trust deeds securing issues of bonds to the public." Detroit Trust Co. v. The Barlum, 293 U.S. 21, 40, 55 S.Ct. 31, 37, 79 L.Ed. 176 (1934).

None of the authorities cited makes a distinction between "public" and "private" issues and all of them can be read to embrace the issue of a single bond to a single member of the "public."

Much of the apparent difficulty in this case is caused by the artificiality of the distinction between "public" and "private" bond issues. The record shows no instance where precisely such a distinction has been drawn. The objectors meet this deficiency by making the distinction themselves, then arguing that the evidence does not clearly show that Congress did not adopt such a distinction. A public-private dichotomy did not exist until Congress made reference to public and nonpublic *offerings* in section 4(1) of the Securities Act of 1933. 48 Stat. 77 (1933), 15 U.S.C.A. § 77d (1958). Congress used the word "issue" to distinguish *classes* of securities and not the number of purchasers. See Loss, Securities Regulation 577, 591 (1961). Thus we fail to find an ambiguity justifying abandonment of the literal meaning of "bond issue"—the issue of a bond or bonds.

As the District Court points out, however, a literal meaning may be rejected if its adoption would frustrate the statutory purpose giving rise to the Ship Mortgage Act. Review of the ends attempted to be accomplished reveals just the opposite, that acceptance of any construction other than the literal one will undercut the congressional purpose. The 1920 Act cannot be understood without reference to earlier history.

At the beginning of the First World War the American ocean-going merchant marine was almost nonexistent. Congress, concerned with the scarcity of domestic shipping, the withdrawal of ships by aliens, and inflated freight rates, adopted the Shipping Act of 1916. 39 Stat. 728 (1916), now codified with amendments in 46 U.S.C.A. §§ 801–842 (1958).[2] Congress hoped that the small private merchant marine that did exist could be preserved by insuring that control over American ships would remain in domestic hands. To achieve this end section 9 was adopted, the predecessor of 46 U.S.C.A. § 808. Paragraph 2 of that section provided that no ship purchased from the Maritime Board could be leased, sold or chartered to "any person not a citizen of the United States," without first obtaining the approval of the Secretary of Commerce. Paragraph 3 added that such approval would similarly have to be obtained for the transfer during a war or national emergency of any ship registered under our laws. The Shipping Act of 1916 was thus enacted to preserve what merchant marine we did have.

In the year following the passage of this Act German submarines began to decimate allied shipping. Foreign capital made systematic attempts to replenish their losses by gaining control of American vessels.[3] To thwart such raiding activities Congress added section 37 to the Shipping Act, 40 Stat. 901 (1918), 46 U.S.C.A. § 835 (1958). This section enlarged on paragraph 3 of section 9 by

---

2. See House Rep. No. 659, 64th Cong., 1st Sess., 50 (1916).

3. See House Rep. No. 568, 65th Cong., 2d Sess. (1918).

providing that it shall be unlawful during a war or national emergency to do the following without first obtaining the approval of the Secretary of Commerce:

"(b) To sell, mortgage, lease, charter, deliver, or in any manner transfer * * * to any person not a citizen of the United States, (1) any such vessel or any interest therein * * *."

"Mortgages" were added to the list of restrictions because they had "proved to be a common device by which foreign capital has sought to obtain control of American vessels." 56 Cong.Rec. 8026 (1918). Then in 1920 section 9 of the Shipping Act was amended to extend the added restrictions of section 37 to peacetime transfers of interests in ships documented under the laws of the United States. 41 Stat. 994 (1920), 46 U.S.C.A. § 808 (1958). The Shipping Act, as amended, thus had a positive end and a negative means—it was hoped that our merchant marine might be built up and preserved by preventing its slipping into foreign hands.

At the close of the First World War a new situation arose which gave rise to pressures eventually resulting in the Ship Mortgage Act of 1920. When the war in Europe ended the United States Government owned 1280 ocean-going flag ships. Gilmore and Black, The Law of Admiralty 570 (1957). Promptly Congress authorized the dismantling of this fleet and its sale to privately owned shipping lines. H.R.Rep.No.443, 66th Cong., 1st Sess., 4, 9 (1919). It was soon realized, however, that this result could not be accomplished unless considerable new capital could be attracted to the private shipping industry. To this end the Ship Mortgage Act of 1920 was enacted.

Investment in shipping has been frustrated over the years by the absence of an effective security device. The common law mortgage was of little use in the shipping industry because it was not considered by admiralty courts to be a maritime contract. This meant that it would be subordinate to all maritime liens whenever they attached. Bogart v. The

Steamboat John Jay, 17 How. 399, 58 U.S. 399, 15 L.Ed. 95 (1854); see Gyory, Security at Sea: A Review of the Preferred Ship Mortgage, 31 Ford.L.Rev. 231 (1962). The Ship Mortgage Act breathed new life into ship mortgages by according them a preference over most subsequently attaching maritime liens. 41 Stat. 1004 (1920), 46 U.S.C.A. § 953 (1958). However, a mortgage was not eligible for this preferred treatment unless the mortgagee was a citizen of the United States, and the term " 'mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder," was defined as "the trustee designated in such deed." 41 Stat. 1000 (1920), 46 U.S.C.A. §§ 922(a) (5), 911 (5) (1958). This citizenship requirement, unlike that of the Shipping Act, was absolute and could not be waived by the Secretary of Commerce.

■■ The essential purpose of Congress in enacting the Ship Mortgage Act was to promote ship financing by affording substantial security to investors. Merchants & Marine Bank v. The T. E. Welles, 289 F.2d 188, 193 (5th Cir. 1961). Unquestionably the attractiveness of any investment is diminished when there is uncertainty as to its validity. The Ship Mortgage Act thus speaks in absolutes. Mortgages to noncitizens are put wholly outside the preferential benefits of the Act, but in the case of a bond issue, the citizenship of the trustee is made controlling. A reading of the phrase "bond issue" that incorporates an uncertainty into the Ship Mortgage Act and seriously impairs marketability should not be favored unless the statutory language makes it unavoidable.

■ The District Judge was rightly troubled by the many casual references in the legislative history to issues of bonds to large numbers of investors. It must be conceded that bond issues and trust indentures were originally devised to avoid the necessity of issuing a security document to each member of a large group of creditors. One mortgage was executed to a trustee and he held it in

trust for all the creditors. Butler v. Rahm, 46 Md. 541, 546 (1877).

When speaking of bond issues it was only natural that the image evoked was that of a large number of bondholders, but no legal result had ever turned on the number of bondholders under a trust indenture. Though Congress may have assumed unconsciously that large numbers of investors would likely be involved, this assumption was not incorporated into the statute. The objecting creditors offer no feasible rule for determining at what point a "bond issue" is excluded from the meaning of the Ship Mortgage Act because of the diminished number of bondholders.

An argument vaguely similar to that addressed to us in this case was rejected by the Supreme Court in Detroit Trust Co. v. The Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934). There objecting creditors contended plausibly that a ship mortgage is not eligible for preferred status when the proceeds are used for nonmaritime purposes. The Court held that the intensive anaylsis by Congress when the Ship Mortgage Act was passed and the specificity of the statutory provisions prevented the Court from reading in qualifications not found on the face of the statute.

> "We are not at liberty to imply a condition which is opposed to the explicit terms of the statute * * *. To hold that a mortgage is not within the Act which the Act itself states is within it, is not to construe the Act but to amend it. The question of policy—whether different terms should have been imposed—is not for us. We may not add to the conditions set up by Congress any more than we can substract from them." Detroit Trust Co. v. The Barlum, 293 U.S. 21, 38, 55 S.Ct. 31, 36 (1934).

The legislative history of the Ship Mortgage Act does not permit, much less does it compel, the interpretation urged upon us. Extensive references have been made to the hearings and debates pre-ceding the adoption of the Shipping Act and its amendments to show that Congress was concerned with the amount of control that was being exercised over American ships by aliens. This concern led to restrictions on mortgages to noncitizens, and, it is argued, the restrictions would be meaningless if a foreign investor could secure the same objective by taking a bond instead of a mortgage.

It is beyond question that the possibility of alien control was of vital concern to Congress but the legislation primarily designed to meet that evil was found in the Shipping Act, rather than the Ship Mortgage Act. Questions of alien control should be fought out under these statutory provisions where the Secretary of Commerce, acting through the Maritime Administration, is granted the discretion to approve or condemn the control sought in a particular case.

■■ The Ship Mortgage Act comes into play only after the degree of alien control has been determined and there has been approval under the Shipping Act, since only a "valid mortgage" under the Shipping Act is eligible for preferred status under the Ship Mortgage Act. If the degree of control by the alien is deemed by the Administration not inconsistent with the national interest it will give its approval under the Shipping Act. There is no indication that Congress meant to require a second application of discretion under the Ship Mortgage Act to determine whether the security interest should be preferred. The preference follows if the mortgagee or trustee is an American citizen and the other provisions of the Ship Mortgage Act are met.

■ The distinction made by the Ship Mortgage Act in respect to citizenship is among security devices that have already met Administration approval as provided by the Shipping Act. The provisions of the Ship Mortgage Act encourage certain investments by aliens, those made as bondholders. Not encouraged are those made by aliens as mortgagees, even if the mortgage has been approved by the Maritime Administration.

The heart of the objectors' contention is that an alien secures almost as much potential control by taking a single bond for an entire issue under a trust indenture as by taking the mortgage directly. If this is true, it is said that there would have been no reason for Congress to encourage one and not the other. The validity of this suggestion turns on the question whether in 1920, when the distinction was made between direct mortgages and bond issues, there was a significant difference between the status of a mortgagee and that of the owner of all the bonds issued under a trust indenture.[4]

■ As bondholder Landesbank is in a less dominant position than it would have been as direct mortgagee, for in that case it could foreclose the mortgage solely on its own initiative. The bondholder, it is true, can also initiate a foreclosure but only after certain conditions have been satisfied. A demand must first be made on the trustee to foreclose. The bondholder may then proceed if the trustee refuses to act, unless the refusal is based on a legitimate reason. The bondholder may not proceed until the validity of the reason has been ruled on by a court. Nashua Savings Bank v. Burlington Electric Light Co., 99 F. 14 (S.D. Iowa 1900).

■ The trustee has an independent role and is within his rights in refusing to obey a bondholder whose instruction is illegal. Central Trust Co. of Illinois v. Owsley, 188 Ill.App. 505 (1914). See also Huffman v. Gould, 327 Ill.App. 428, 435, 64 N.E.2d 773, 777 (1946). The Shipping Act makes it illegal for anyone to transfer any interest in an American ship to a noncitizen without the approval of the Maritime Administration. 46 U.S.C.A. §§ 808, 835. The trustee might with impunity refuse to foreclose the mortgage when the potential purchaser of the ship is a noncitizen. Indeed the trustee would be criminally liable if he made a transfer in violation of the statute. His refusal to act would certainly delay the foreclosure, and might entirely prevent the bondholder from foreclosing directly.

The alien as mortgagee is more likely to disregard American law since he is beyond the jurisdiction of American courts. This practical immunity is also important when the American shipowner-debtor is undergoing a judicially supervised reorganization. If a mortgage is held by an American trustee a bankruptcy court, for example, could enjoin the trustee from foreclosing pending an equitable resolution of the debtor's financial problems. If an alien held the mortgage directly he would be personally beyond the jurisdiction of the American courts, freer to proceed as he alone thought best.

■ It was also clear in 1920 that a trustee's loyalties were not exclusively to the bondholders. A duty was owed to the debtor as well. Wright v. Chandler, 180 Ill.App. 476 (1913); Charles Green Real Estate Co. v. St. Louis Mutual House Bldg. Co., 196 Mo. 358, 93 S.W. 1111 (1906); Ashuelot R. R. Co. v. Elliot, 57 N.H. 397 (1874). This dual duty could conceivably frustrate a bondholder's desire for immediate foreclosure and sale when the debtor is trying to work out a plan that will enable him to continue in business.

■ Finally, bondholders are bound by the good faith actions of the trustee. 4 Cook, Corporations 3564 (1923). The decision of a trustee as to the timing of a foreclosure, the maintenance of the secured property or the schedule of payments on the debt could easily conflict with and frustrate the bondholder's desires.

When an investor takes a bond under a trust indenture he gives up some of the power that would be available to him as mortgagee.[5]

---

4. It is conceded that the trust indenture in this case is the standard one and there is no indication that it differs significantly from the trust indentures in use in 1920.

5. There were and are important reasons why a single lender might choose to take a whole bond issue under a trust indenture rather than a direct mortgage. The investor may want to have someone

We have seen then that in 1920 Congress was acting to some extent with divergent, if not contradictory, motivations. On the one hand it sought to exclude alien interest in American shipping. To achieve this goal the Shipping Act was amended to reaffirm and extend to peacetime the provision adopted during World War I, voiding the transfer of "any interest" in an American ship to a noncitizen, unless the transfer was approved. At the same post-war session, however, there was a consensus that investment in American shipping should be encouraged, including investments by aliens. The latter purpose was implemented by the enactment of the Ship Mortgage Act, according a preference to certain maritime mortgages. Mortgages to aliens, even if approved, were not eligible for preference under this latter Act, but "bond issues" to aliens were encouraged. Furthermore, as pointed out in Detroit Trust, supra, Congress wished to delineate clearly the area of favored investments so that they would be readily marketable.

We construe the Ship Mortgage Act then to implement this purpose. We hold that the term "bond issue" includes a single bond representing a whole issue to a single investor. The mortgage to Chemical is therefore entitled to preferred status if it is otherwise valid.

## II

For a mortgage to be entitled to preferred status under the Ship Mortgage Act, it must first be a "valid" mortgage. 46 U.S.C.A. § 922(a). The trustee in bankruptcy of the Seatrade Corporation contends that the mortgage upon which Chemical is suing was rendered invalid by the issuance of a bond for the amount of the mortgage to Landesbank, an alien bank, without the approval of the Maritime Administration in violation of the Shipping Act. 46 U.S.C.A. § 835(b). That section voids the

else manage the debt or he may want to make it possible to split up the investment for wider distribution at some time in the future.

transfer of "any interest" in an American ship to a noncitizen during a war or national emergency if the transfer is made without the approval of the Maritime Administration.[6] This contention rests on two assumptions: first, that the bond issued to Landesbank is an "interest" in the SS. WESTHAMPTON; and second, that the transfer of the bond to an alien, illegal because made without Maritime Administration approval, infects the mortgage under which it was issued. We believe that both of these assumptions are justified.

The Shipping Act provides no definition of the term "interest." It was first used in 1918 when section 37, now 46 U.S.C.A. § 835(b), was added. As noted above, Congress was concerned by the continued inroads on American shipping by alien interests. The 1916 restriction forbidding unapproved "sales, leases and charters" of domestic vessels had not proved effective. To plug loopholes that had been discovered in this language Congress added a prohibition against the transfer of "any interest" in an American ship during war or national emergency, unless the transfer was first approved by the Maritime Administration.

The proposed amendment, set out in H.R. 12100, was designed to combat attempts "by every device which legal ingenuity could suggest to evade" the terms of the 1916 Act. 56 Cong.Rec. 8026 (1918). A war was in progress and Congress was in a mood for extreme measures. Congressman Saunders of Virginia, a member of the House committee that had considered the amendment, expressed the sense of the committee:

"We have sought to make the language used so sweeping and comprehensive that no lawyer, however ingenious, would be able to work out any device under this section to keep the letter, while breaking the spirit of the law." 56 Cong.Rec. 8029 (1918).

6. A national emergency was proclaimed by the President in 1950. Proc. No. 2914, Dec. 16, 1950, 15 Fed.Reg. 9029 (1950). The proclamation is still in effect.

Concern was expressed on the floor of the House that the bill as reported out was too restrictive. It was noted that the broad language would restrict a sale to an alien of a single share of stock in a corporation owning an American ship, thus severely damaging the negotiability of such stock. Congressman Saunders, unmoved by the suggestion as to the consequences to negotiability, explicitly answered that the legislation was intended to cover such minority stock holdings. 56 Cong.Rec. 8037 (1918).

The legislative history of the 1918 amendment pointedly demonstrates the extent to which Congress was prepared to go in preventing or at least controlling the degree of any alien interest in American shipping. It also shows the congressional purpose that a share of stock should be considered an "interest" in the property owned by the issuing corporation. No reference was made, however, to bonds covered by a deed of trust secured by a mortgage on an American ship.

The term "interest" can have a variety of meanings. The most precise is the real property usage, an estate in land, that was developed by the English common law. Ladd v. Ladd, 8 How. 10, 49 U.S. 10, 12 L.Ed. 967 (1850). The term has also been used to indicate any claim in or upon property. Ormsby v. Ottman, 85 F. 492, 497 (8th Cir. 1898). As we are construing a penal provision we adopt the narrower definition though it is far from clear that Congress employed the term "interest" in a technical sense.

In a mortgage-trust indenture the property securing the debt is conveyed to a mortgagee-trustee.[7] Chemical thus holds the legal title to the mortgaged property, the SS. WESTHAMPTON. When the bond was issued by the trustee the relation of trustee and cestui que trust arose between it and the bond-

holder, Landesbank. York v. Guaranty Trust Co. of New York, 143 F.2d 503 (2d Cir. 1944), rev'd on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Land Title Bank & Trust Co. v. Baron, 341 Pa. 241, 19 A.2d 62 (1941); Sprigg v. Commonwealth Title Ins. & Trust Co., 206 Pa. 548, 56 A. 33 (1903). Landesbank's "interest" in the ship is the interest of a trust beneficiary in the property legally held by the trustee. See O'Beirne v. Allegheny & Kingua R.R. Co., 151 N.Y. 372, 45 N.E. 873, 875 (1897).

Scholars have long debated whether the beneficiary of a trust has a property interest in the trust res or merely a personal right against the trustee. See, e. g., Scott, The Nature and the Rights of the Cestui Que Trust, 1917 Col.L.Rev. 269 (1917); Stone, The Nature and the Rights of the Cestui Que Trust, 1917 Col.L.Rev. 467 (1917). The courts have had less trouble with this question. The Supreme Court has held that beneficiaries of a trust have an interest in the property to which the trustee holds legal title. Senior v. Braden, 295 U.S. 422, 55 S.Ct. 800, 79 L.Ed. 1520 (1935); Brown v. Fletcher, 235 U.S. 589, 35 S.Ct. 154, 59 L.Ed. 374 (1915).

A bondholder is not a general creditor, but has specific rights with respect to the mortgaged property. He is entitled to protection against the unlawful acts of the trustee or others resulting in waste or destruction of his security. Ikelheimer v. Consolidated Tobacco Co., 59 A. 363 (N.J.Ch.1904). He may sue to prevent the impairment of his security without reference to the maturity of his bonds. Whitmore v. International Fruit & Sugar Co., 214 Mass. 525, 102 N.E. 59 (1913).

Although a bondholder has less control over the secured property than a direct mortgagee he still possesses a considerable degree of control. The negotiations

---

7. The mortgage-trust indenture from Seatrade to Chemical provides as follows: "[B]y these presents does hereby grant, bargain, sell, remise, release, convey, assign, transfer, mortgage, deliver and pledge, or cause to be granted" the SS. WESTHAMPTON.

leading to this mortgage were carried on between the investor and the debtor, here Landesbank and Seatrade. As a general proposition, the trustee must do as he is told by the bondholder unless the instructions are illegal or immoral. The convenience of mortgaging the ship to a trustee should not obscure the fact that the debt secured is that owed to the bondholder.

> "Although the mortgage and its agreements are made to and with the [trustee] yet the promise of the [debtor] is for the payment of money to the holder of its bonds, and it was to furnish security for the performance of that promise that the mortgage instrument was executed and delivered. The bondholders are the beneficiaries of the mortgage or deed of trust, and that instrument contains, in effect, a contract made for their benefit through a trustee as a convenient intermediary." O'Beirne v. Allegheny & Kingua R. R. Co., 151 N.Y. 372, 383, 45 N.E. 873, 875 (1897).

In the early years following the enactment of the Ship Mortgage Act the administrative officials seem to have had no doubt that Congress was concerned with alien ownership of bonds. A few years after the First World War the predecessor of the Maritime Administration, the Shipping Board, was asked to rule whether the assignment of a bond to an alien would violate section 961(d) of the Ship Mortgage Act.[8] The Board, refusing to approve such a transfer, stated:

> "Is it not therefore clear that Congress had in view the prohibition against an interest and a right under a mortgage being assigned either directly or as incidental to the assignment of the debt? It is easy to imagine that a person not a citizen of the United States might acquire all of the bonds secured by a mortgage. It would thus become the owner of the entire interests under the mortgage and obviously such a transaction is the very one which Congress sought to prohibit." [9]

We are led to the conclusion therefore that, both as a general principle and in the contemplation of Congress, a ship mortgage bond is an interest in the ship mortgaged.

The Maritime Administration, however, in several recent opinion letters, has ruled that a bond is not an "interest" in the mortgaged ship and that it will therefore not exercise its discretion in determining whether the particular bond issue is permissible.[10] This position has been taken without any apparent consideration of the legislative history of the Shipping Act or the Shipping Board's earlier rulings under 46 U.S.C.A. § 961 (d). Complete reliance was placed on the definitional section of the Ship Mortgage Act, 46 U.S.C.A. § 911(5), which, as we have seen, defined "mortgagee" as the trustee where there is a deed of trust and a bond issue. Such an analysis is fallacious and completely unwarranted.

First, the definitions found in 46 U.S. C.A. § 911(5) refer only to terms used in the Ship Mortgage Act. Second, the term defined by 46 U.S.C.A. § 911(5) is "mortgagee"; the disputed word in the Shipping Act is "interest." Third, the definition of "mortgagee" in the Ship

---

8. "No rights under a mortgage of a vessel of the United States shall be assigned to any person not a citizen of the United States without the approval of the Secretary of Commerce." 46 U.S.C.A. § 961 (d).

9. Letter of January 2, 1924, from Chauncey G. Parker, General Counsel, addressed to Messrs. Squire, Sanders & Dempsey, The Leader-News Building, Cleveland, Ohio. A similar ruling was made in a letter of April 6, 1927, from Chauncey G. Parker, General Counsel, addressed to Messrs. Denegre, Leovy & Chaffe, 724 Whitney Central Building, New Orleans, Louisiana.

10. See, e. g., letter from E. Robert Seaver, General Counsel, to Charles S. Cunningham, One Twenty Broadway, New York 5, New York, May 11, 1959; letter from James L. Pimper, General Counsel, to Robert E. Kline, Jr., Munsey Building, Washington 4, D. C., October 19, 1960.

Mortgage Act was adopted two years after the insertion of the term "interest" into the Shipping Act. Fourth, the Shipping Board, when construing section 961(d) of the Ship Mortgage Act, did not indicate that section 911(5) affected in any way its exercise of discretion in determining whether to permit the assignment of bonds to noncitizens. See supra, at p. 585.

The only possible explanation for the later policy of the Maritime Administration is its unconscious assumption that 46 U.S.C.A. § 911(5) of the Ship Mortgage Act impliedly amended the Shipping Act to delete the interest of a bondholder from those interests requiring approval. There is no indication in the legislative history that such a result was intended. Implied amendment is not favored if two pieces of legislation can be reconciled. We have already seen that such a reconciliation is both possible and rational: Transfers of bonds to aliens must first be approved by the Maritime Administration. If approval is given and there is an American "mortgagee" the mortgage is eligible for preferred status under the Ship Mortgage Act. In adopting the Ship Mortgage Act in 1920 the endeavor of Congress was to avert foreign control while encouraging private investment, whatever the nationality of the investor. Mortgages to aliens were not encouraged because they were thought to involve too much potential control. Yet it was believed that in selected cases some mortgages in alien hands might safely be permitted to take an unpreferred status. Bond issues, however, presented more variables than mortgages. There might be one bondholder or the holdings might be diffused among a thousand, the control exercised by each bondholder varying accordingly. If the Maritime Administration approved the bond issue then the mortgage securing it was eligible for a preference if the mortgagee was an American citizen.

■■■ The effect of an unapproved, hence illegal, bond issue on the mortgage to the trustee is a less troublesome question. The debt is represented by the bond; the trustee only holds the mortgage for the protection of the bondholder. Chemical has no personal interest in the mortgage. The mortgage and the bond represent one loan. If one falls, so does the other.

■■■ Chemical argues that great weight should be given to the recent attitude of the Maritime Administration that bonds are not interests in the ship mortgaged. While it is true that courts, as a genral rule, pay great deference to administrative decisions they do so only for certain compelling reasons.[11] Many of those reasons are not present in this case. The recent rulings were not an exercise of quasi-legislative discretion vested by statute in the Administration. They were interpretations of statutory language. Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 134–135, 56 S.Ct. 397, 80 L.Ed. 528 (1936). They were not substantially contemporaneous with the passage of the Act, see United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), nor are they representative of a long standing agency practice. See United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84, 53 S.Ct. 42, 77 L.Ed. 175 (1932). The overruling of decisions facing in the opposite direction, made during the 1920's, was not based upon a re-examination of the underlying facts and policies that should be considered a part of the legislation construed. National Labor Rel. Bd. v. Globe Automatic Sprinkler Co., 199 F.2d 64, 68 (3d Cir. 1952). In any event, the alien lender in this case did not ask

---

11. The weight given a decision of an administrative agency "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (Jackson, J.).

the Maritime Administration to approve the issuance of the bond.

We recognize the resulting embarrassment when an administrative body, misinterpreting a statute, declines to exercise its lawful jurisdiction. A court, however, for the reasons above stated, may not, in the present circumstances, ignore the statute's command. Being invalid the mortgage is not entitled to the claimed preference.

The order of the District Court is Affirmed.

## ON PETITION FOR REHEARING EN BANC

### ORDER

The court having fully considered the petition for rehearing en banc, the replies thereto and numerous supplemental memoranda and responses, the petition is hereby denied.