**In re PRUDENTIAL LINES, INC., Debtor.**

**Bankruptcy No. 86 B 11773.**

United States Bankruptcy Court, S.D. New York.

Jan. 22, 1987.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y. by James L. Garrity, Jr., U.S. Dept. of Justice, New York City by Marie L. Hagen, U.S. Dept. of Justice, Washington, D.C. by John T. Stemplewicz, for U.S.

Stroock & Stroock & Lavan, New York City, for debtor by Sheldon I. Hirshon.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for Union Minerals and Alloys Corp. by Kenneth S. Goodkind.

## DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

On this motion for a preliminary injunction, we are given the unenviable task of construing statutory language containing material inconsistencies that are not directly addressed by the legislative history. Prudential Lines, Inc. ("PLI" or the "Debtor"), the debtor-in-possession in this proceeding under Chapter 11 of the Bankruptcy Code (the "Code"), 11 U.S.C. § 1101 *et seq.* (1986), and Union Minerals and Alloys Corp. ("UMAC"), a petitioning creditor, seek a preliminary injunction enjoining the United States Maritime Administration ("MarAd") from causing the sale of either of two PLI vessels (the LASH ATLANTICO or the LASH PACIFICO, collectively the "Chartered Vessels") in connection with its pre-petition *in rem* admiralty actions. This Court granted a temporary restraining order (the "TRO") preventing the sale of the Chartered Vessels prior to the rendering of this decision. The TRO was conditioned, however, on the posting of a bond of $125,000, by no later than noon on December 22, 1986, to cover depreciation and the costs incurred by MarAd during its pendency. Apparently, the bond has been posted and thus the TRO is operative. The issue before us, as agreed by the parties, is whether the recently enacted § 362(b)(12) exemption to the automatic stay permits MarAd to foreclose on and conduct an interlocutory sale of the Chartered Vessels. The matter was finally submitted on January 9, 1987.

### I.

An involuntary Chapter 11 petition was filed against PLI on September 12, 1986, by Norfolk Shipbuilding & Drydock Corp., Baltimore Ship Repair, Inc. and UMAC, the beneficial owner of the Chartered Vessels. PLI consented to the entry of an order for relief on November 4, 1986 and such an order was subsequently entered. Prior to May 1986, when PLI's operations were halted due to the arrest of its vessels, PLI was in the business of providing U.S.—flag ocean liner service between the United States' east coast and various ports in the Mediterranean and Black Seas. PLI utilized its own vessel, the LASH ITALIA,

and the two Chartered Vessels in its service.

From the papers before us, it appears that PLI constructed and originally owned the Chartered Vessels. To finance the construction of the Chartered Vessels, PLI issued two series of United States Government Insured Merchant Marine Bonds. The Irving Trust Company (the "Trustee") is the successor trustee under the indentures pursuant to which the bonds were issued. In October 1974, PLI sold the vessels to the United States Trust Company ("USTC"). The Chartered Vessels were purchased by USTC in its capacity as trustee under a trust agreement with UMAC, as settlor. Simultaneously therewith, USTC chartered the Chartered Vessels to PLI pursuant to two bareboat charter party agreements.[1]

In connection with USTC's purchase of the Chartered Vessels, USTC assumed and agreed to pay the principal and interest on the Bonds. As security therefor, USTC assigned the charter party agreements to the Trustee. USTC also delivered a first preferred ship mortgage on each vessel to the Trustee. MarAd entered into insurance contracts with the Trustee to insure full payment of the bonds. Pursuant to the terms of the insurance contracts, in the event of default by USTC and performance by MarAd, the Trustee was required to assign its interest in the first preferred ship mortgages and charter party agreements to MarAd.

PLI failed to make payments as required under the charter party agreements and USTC defaulted on the mortgage obligations tendered to the Trustee. On May 15, 1986, the Trustee demanded payment under the terms of the insurance contracts. MarAd paid the Trustee over $9,000,000.00 pursuant to the insurance contracts. Thereafter, the Trustee assigned all of its rights in the charter party agreements and the first preferred ship mortgages to MarAd.

MarAd then filed two actions in admiralty as an arresting party in the United States District Court for the Eastern District of New York. As the party holding the largest claim, MarAd agreed to bear approximately ninety percent of the charges for which the arresting parties are responsible, including, *inter alia*, custodial and marshal's liability insurance charges which it estimates are accruing at a daily rate of $1,300.00 per vessel. To protect its interest in the Chartered Vessels and to toll the accrual of expenses, MarAd moved, in the district court, for the interlocutory sale of the Chartered Vessels. The court fixed September 15, 1986 as the sale date. On September 12, 1986, UMAC and two other creditors filed the involuntary petition.

Nothing occurred until October 21, 1986, when this Court signed an order to show cause scheduling a hearing on October 27, 1986 to determine whether MarAd should be granted relief from the automatic stay to intervene in litigation pending before various Italian tribunals in order to foreclose its mortgages on the LASH ITALIA. At the October 27, 1986 hearing, the Court granted relief with respect to the LASH ITALIA by modifying the automatic stay to permit MarAd to intervene in any and all Italian arrest proceedings and to assert all of their rights short of foreclosure (Transcript, October 27, 1986, at 29–30). At the same hearing, MarAd requested an expedited schedule to hear its motion with respect to the Chartered Vessels (Transcript, October 27, 1986, at 39). The Court noted that no motion had yet been filed with respect to those vessels and indicated that it would hold an evidentiary hearing on that matter when it was properly before the Court (Transcript, October 27, 1986, at 40).

---

1. The Debtor asserts that the bareboat charters are demise charters under admiralty principles and cites G. Gilmore & C. Black, *The Law of Admiralty* 239–42 (2d ed. 1975), for the proposition that, as demise charterer, the Debtor is to be looked upon as the owner of the Chartered Vessels. However, we need not address that issue, as it is clear that the bareboat charters constitute property of the estate giving this Court jurisdiction over them pursuant to 28 U.S.C. §§ 1334(d) and 157(a), and upon the reference by the district court. *See Rebco Towing Co. v. River Line, Inc. (In re River Line, Inc.)*, 19 B.R. 158, 162–63 (Bankr.M.D.Tenn.1982).

On October 31, 1986, MarAd noticed a motion seeking to have this Court, pursuant to 11 U.S.C. § 365(d)(2), set a time within which PLI would be required to assume or reject the Charter Agreements, *see Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 106 (2d Cir.1982); *In re Beker Industries Corp.*, 64 B.R. 890, 897 (Bankr.S.D.N.Y. 1986), and seeking relief from the automatic stay provided by § 362 of the Code. At the request of the parties, a chambers conference was held regarding this motion on November 12, 1986 and the Court scheduled an evidentiary hearing for December 16, 1986. MarAd, however, subsequently requested a chambers conference for December 5, 1986. At that conference, MarAd stated that it would not pursue its motion but, instead, would merely take the position that the stay of the admiralty actions had ceased to apply as a matter of law pursuant to 11 U.S.C. § 362(b)(12). A procedure was agreed to by MarAd, UMAC and PLI whereby MarAd would consent to a temporary restraining order preventing it from foreclosing on the Chartered Vessels and a briefing schedule was set regarding the issue of the construction of the newly enacted § 362(b)(12) of the Code. That schedule contemplated argument of this issue on January 8, 1987. MarAd was to settle an order on notice to PLI and UMAC outlining the provisions of the agreement reached during the chambers conference.

The parties failed to agree on the details of that order and subsequently, MarAd informed UMAC and PLI that it would seek, instead, to foreclose immediately on the Chartered Vessels. PLI and UMAC responded by bringing the present motion for a preliminary injunction. At the December 18, 1986 hearing on this motion, the Court observed that the representatives of the Military Sealift Command ("MSC") who were present at the December 5, 1986 chambers conference had noted that MarAd's foreclosing on the Chartered Vessels might be in contravention of the military needs of the United States. They had then stated that the MSC had asked for bids for two vessels and that the MSC desired PLI to remain a part of the competitive bidding process in order for it to have the widest latitude in fulfilling those needs. The Department of Justice thereupon represented that the MSC was no longer of that view. Instead of submitting evidence on that issue, the parties agreed to proceed solely on the legal issue of whether § 362(b)(12) of the Code would permit MarAd to proceed with an interlocutory sale of the Chartered Vessels, upon the expiration of the ninety-day period referred to in § 362(b)(12).

MarAd contends that the ninety-day period codified in § 362(b)(12) expired on December 11, 1986 and that the statute permits an interlocutory sale of the Chartered Vessels. PLI and UMAC contend that § 362(b)(12) contemplates the filing of a petition by the Secretary of Transportation to commence the ninety-day period and asserts that the exemption is inapplicable since the petition has not yet been filed. They argue, moreover, that, at most, § 362(b)(12) entitles MarAd to foreclose on the Chartered Vessels and that it does not permit an interlocutory sale of property of the estate by a court other than the bankruptcy court with jurisdiction over the estate's property. Alternatively, they argue that, even were § 362(b)(12) construed to permit an interlocutory sale, this Court should enjoin such a sale pursuant to 11 U.S.C. § 105. They assert that a sale, prior to the MSC's award of the charters, would destroy the Debtor's ability to reorganize. This alternative, however, is not before us because of the parties' agreement to proceed solely on the issue of § 362(b)(12)'s applicability and scope and also because no evidence was submitted on that issue.

## II.

In interpreting the exception to the automatic stay upon which MarAd relies, § 362(b)(12), it is necessary "to keep in view also the structure of the statute, and the relation, physical and logical, between its several parts," *Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 218, 56 S.Ct. 412, 413, 80 L.Ed. 591 (1936), and to

construe it in light of those related provisions. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975).

■ The stay, provided for in § 362 of the Code, is a fundamental tool of bankruptcy serving two principal purposes: (i) it provides the debtor with a "respite" or "breathing spell" "that enables the debtor to recapture his bearings" and "adjust to the trauma which accompanies the filing of a petition in bankruptcy ...", *In re Colin, Hochstin Co.*, 41 B.R. 322, 325, Bankr.L. Rep. (CCH) § 69,692 (Bankr.S.D.N.Y.1984); and (ii) it assembles "all the creditors and their claims into the bankruptcy court for a single organized proceeding." *Id.* Absent such a stay, the debtor would remain subject to creditors' collection efforts and potential harassment, while creditors would be forced to pursue the debtor's property hastily and sporadically because they are not guaranteed equal treatment in an orderly liquidation procedure. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340–42 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 49–51 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Thus, exceptions to the stay should be read narrowly, *see, e.g.*, 124 Cong.Rec. H11,092 (Sept. 28, 1978); *id.* at S17,409 (Oct. 6, 1978), unless a broader interpretation must have been contemplated by Congress when it enacted the exception, *see, e.g., In re Beker Industries Corp.*, 57 B.R. 611, 626, 14 B.C.D. 136 (Bankr.S.D.N.Y.1986).

■ But, because continuation of the automatic stay can prejudice others, Congress provided for its modification or vacatur for "cause." 11 U.S.C. § 362(d). If such a motion is denied, a secured creditor, or other entity having an interest in the debtor's property, must receive adequate protection against further deterioration of its position. *E.g., Lend Lease v. Briggs Transportation Co. (In re Briggs Transportation Co.)*, 780 F.2d 1339, 1342–43 (8th Cir.1985); *Barclays Bank of New York, N.A. v. Saypol (In re Saypol)*, 31 B.R. 796, 799–802, 10 B.C.D. 1057, Bankr.L.Rep. § 69,333 (Bankr.S.D.N.Y.1983); *Imperial*

*Bank v. El Patio, Ltd. (In re El Patio Ltd.)*, 6 B.R. 518, 522, 6 B.C.D. 1098 (Bankr.C.D.Cal.1980).

Section 362(a) enumerates the acts automatically stayed by the filing of a petition in bankruptcy. Efforts by MarAd to further foreclose on the Chartered Vessels, to proceed to final judgment on the merits of its claims against the Chartered Vessels or to sell them, by interlocutory sale or otherwise, are subject to the automatic stay, unless an exception pursuant to § 362(b) is applicable. *See* 11 U.S.C. § 362(a)(1)–(6). MarAd does not claim that it is acting as a governmental unit to enforce the police or regulatory power of the United States in a manner that is excepted from the stay under § 362(b)(4) or (5). Instead, it relies solely on its contention that the newly enacted § 362(b)(12) applies to the present case and excepts all of the aforementioned acts from the ambit of the automatic stay.

### III.

■ Statutory analysis necessarily begins with examination of the language Congress employed. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). Section 362(b)(12) provides, in pertinent part:

(b) The filing of a petition under section 301, 302, or 303 of this title ... does not operate as a stay—

(12) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under the Ship Mortgage Act, 1920 (46 App.U.S.C. 911 *et seq.*) (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under section 207 or title XI of the Merchant

Marine Act, 1936 (46 App.U.S.C. 1117 and 1271 *et seq.*, respectively), or under applicable State law....

....

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989....

11 U.S.C. § 362(b)(12) (1986). The legislation enacting § 362(b)(12) further provides that it "shall apply only to petitions filed under section 362 of title 11, United States Code, which are made after August 1, 1986." H.R. 5300, 99th Cong., 2d Sess. § 5001(b) (1986).

While Congress has spoken in § 362(b)(12) of the Code, it "cannot be heard clearly because its speech is muffled." Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 535–36 (1947). For example, it is not at all clear what was intended by the reference to "petitions filed under section 362 of title 11" in the legislation enacting § 362(b)(12). That term would not appear, on the face of the statute, to refer to the words "such petition" in § 362(b)(12) and (13), for "such petition," in the three times it is employed, clearly refers to the bankruptcy petition filed under § 301, 302 or 303 of the Code. Nor would it appear to refer to a request for vacatur or modification of the automatic stay pursuant to § 362(d), for such a request is brought on by motion. Rule 4001 of the Rules of Bankruptcy Procedure (1983).

Second, the use of the word "commencement" together with the word "was" in the phrase "of the commencement ... of an action ... which was brought by the Secretary of Transportation under the Ship Mortgage Act ... to foreclose a preferred ship or fleet mortgage ..." is an inherent inconsistency. One can only wonder how it is that an action which was already brought is to be commenced.

Third, the placement of the parenthetical "(including distribution of any proceeds of sale)" immediately after the phrase "which was brought by the Secretary of Transportation under the Ship Mortgage Act, 1920 (46 App.U.S.C. 911 *et seq.*)" makes little sense. If that term is employed to describe the type of action that is exempt, one would think that the phrase would properly be inserted after the words "final judgment."

Resort to the legislative history is thus required. While the legislative history regarding this new provision is hardly conclusive, it does establish four pole stars of congressional intent against which § 362(b)(12) is to be construed: (i) Congress sought to reduce MarAd expenditures, (ii) Congress intended that a full ninety-day grace period apply, (iii) Congress was cautioned to proceed cautiously and sought to do so, and (iv) Congress intended to permit vessels to be sold, at least if there were a pre-petition admiralty *in rem* foreclosure action brought by MarAd on a ship mortgage or security interest held by MarAd under § 207 or title XI of the Merchant Marine Act.

The overriding purpose of § 362(b)(12) is to reduce government spending on title XI maritime loan guarantees. *See* 132 Cong.Rec. S16,924 (daily ed. October 17, 1986) (descriptive material summarizing conference agreement on H.R. 5300, 99th Cong., 2d Sess. (1986)). Congress was told that there has been a recent increase in government spending on title XI ship guarantees, resulting from "[t]he economic recession in the inland, offshore supply and drilling industries [which] is expected to continue as long as world crude oil prices are depressed." *Hearing Before the Subcomm. on Merchant Marine of the Comm. on Commerce, Science, and Transportation on S. 1992 and S. 1993*, 99th Cong., 2d Sess. 12 (March 21, 1986) (statement of John A. Gaughan, Administrator, Maritime Administration).

Initially, Congress sought to accomplish the desired reduction in spending through amendment of § 1110 of the Code. That overbroad amendment would have permitted all secured creditors, including the Secretaries of Transportation and Commerce, to take possession of and foreclose on a vessel, notwithstanding the automatic stay,

according to the terms of their security interests unless, within sixty days of the entry of an order for relief, the trustee or debtor-in-possession, in effect, assumed the debtor's obligations and cured all defaults. S. 1993, 99th Cong., 1st Sess., 131 Cong. Rec. S18,281 (daily ed. December 19, 1985); H.R. 3571, 99th Cong., 1st Sess. (October 16, 1985); *see also* H.R. 2816, 99th Cong., 1st Sess. (June 20, 1985) (prior version of amendment to 11 U.S.C. § 1110 with different terms). A similar amendment to Chapter 13 of the Code was also contemplated. *See* S. 1992, 99th Cong., 1st Sess., 131 Cong.Rec. S18,281 (daily ed. December 19, 1985); H.R. 3572, 99th Cong., 1st Sess (October 16, 1985). At the hearings on these bills, it was suggested that an exception to § 362 of the Code in favor of only MarAd would be preferable and more narrowly tailored to achieve the desired end. *Hearing Before the Subcomm. on Merchant Marine of the Comm. on Commerce, Science, and Transportation on S. 1992 and S. 1993,* 99th Cong., 2d Sess. 63–65 (March 21, 1986) (statement of Thomas L. Mills, Counsel, on behalf of Apex Marine Corp. and Crowley Maritime Corp.).

Accordingly, Senator Stevens introduced S. 2436 which, *inter alia,* would have immediately excepted, with no period for negotiation or cooling-off, "the commencement or continuation of an action by the Secretary of Transportation to foreclose a mortgage on a vessel under the Ship Mortgage Act, 1920 ..., held by the Secretary under section 207 or sections 1101 through 1110 of the Merchant Marine Act ..." from the automatic stay. S. 2436, 99th Cong., 2d Sess. (May 12, 1986).

MarAd, however, was apparently not satisfied and submitted a so-called "technical redraft" of S. 2436. Memorandum from David Dye, Director, Office of External Affairs, U.S. Maritime Administration, to Brad Gilman, Counsel, Subcommittee on Merchant Marine, Committee on Commerce, Science, and Transportation, U.S. Senate (July 9, 1986). The technical redraft would have provided, *inter alia,* that the filing of a bankruptcy petition would not operate as a stay

"(12) under subsection (a) of [§ 362], until December 31, 1990, after 90 days of the filing of the petition, of the commencement, or continuation, and conclusion to the entry of final judgment of an action under the Ship Mortgage Act, 1920 (46 App.U.S.C. 911–984) (including distribution of any proceeds of sale), by the Secretary of Transportation to foreclose a preferred ship or fleet mortgage or a security interest on or relating to a vessel or vessel under construction, held by the Secretary under section 207 or sections 1101 through 1110 of the Merchant Marine Act, 1936 (46 App.U.S.C. 1117 and 1271–1979c) or applicable state law...."

. . . .

SECTION 2. The amendments of section 362(b) set forth in section 1 above shall apply only to filings referred to in section 362(b) which are made after the effective date of this amendment.

*Id.* Thus, had the MarAd proposal been fully adopted, the inconsistencies noted above would not have been contained in the statute. The "redraft" did not state that the action had to be one "which was brought"; nor was there any reference to a so-called "petition filed under § 362."

But Congress did not adopt the MarAd proposal in its entirety. On July 31, 1986, three weeks after submission of the MarAd redraft, S. 2706 was introduced by Senator Domenici, from the Committee on the Budget. S. 2706, 99th Cong., 2d Sess. (July 31, 1986). The bill contained the Senate version of the amendment to § 362 of the Code. *See* S. 2706, 99th Cong., 2d Sess. § 302 (July 31, 1986). It was exactly the same as the amendment to § 362 of the Code proposed in the House of Representatives bill and ultimately enacted. *See* H.R. 5300, 99th Cong., 2d Sess. § 5001 (1986).

Although we have been assured by both the government and PLI that all of the legislative history has been furnished to us, the record is remarkably silent as to the reasons for the changes to the MarAd pro-

posal. Congress has written the § 362(b)(12) exception to apply only ninety days after the filing of a bankruptcy petition, and to require no act to trigger the commencement of the period. It is, therefore, self-executing. The Senate Report accompanying S. 2706, nevertheless, indicates that the Secretary of Transportation is "required to file a petition with the bankruptcy court for relief from the automatic stay and a ninety-day grace period is provided before the stay is lifted." *See* Senate Report of the Committee on the Budget to Accompany S. 2706, 99th Cong., 2d Sess. at 49 (July 31, 1986).

But, regardless of that inconsistency, the report's reference to the time period built into the statute as a "grace period", *see id.*, reflects congressional intent that there be a full ninety-day period. That concept was supported by the Department of Commerce at the Committee hearings, as the time period contemplated by prior bills was similarly termed a "cooling-off period" or a "negotiating period." *See Hearing Before the Subcomm. on Merchant Marine of the Committee on Commerce, Science, and Transportation on S. 1992 and S. 1993,* 99th Cong., 2d Sess. 81 (March 21, 1986) (Department of Commerce comments). Nowhere is there any indication in the legislative history that Congress envisioned a scenario where, for example, a debtor's default occurred on the forty-fifth day after the filing of the bankruptcy petition and there would therefore be only forty-five days for negotiation or cooling-off.

To be sure, the savings sought to be achieved through foreclosure by MarAd was dramatically before Congress. MarAd placed prime importance on its need to foreclose without delay. *Hearing Before the Subcomm. on Merchant Marine of the Comm. on Commerce, Science, and Transportation on S. 1992 and S. 1993,* 99th Cong., 2d Sess. 13 (March 21, 1986) (statement of John A. Gaughan, Administrator, Maritime Administration). Additionally, MarAd expressed its concerns that many failing shipowners file for Chapter 11 relief "to keep their tax credits from unwinding" and that "companies in bankrupt-cy, operating without servicing any capital debt, are in a position to cut rates to the detriment of their competitors." *Id.*

But Congress, for a variety of reasons, was also advised to tread carefully. It was told that it would be unfair to give the government a "right to foreclose on assets in preference to other creditors." *See id.* at 34 (statement of Sharon M. Meadows, Vice President, First Boston Corp.). Also raised was the question of "whether the industry would be any better off if MarAd moved to foreclose immediately and then just resold the assets at a fire sale price, thus putting the asset with virtually no capital cost out on the market ..." *See id.* at 65 (statement of Thomas L. Mills, Counsel, on behalf of Apex Marine Corp. and Crowley Maritime Corp.). Congress was further warned that if MarAd could remove the most productive or the most necessary assets of the company, the ability of the company to reorganize may be destroyed, despite the possibility for an upswing in the industry's cycle. *See id.* at 38 (statement of Ms. Meadows). As Professor King noted, "we have a history of trying to rehabilitate companies in order to protect customers, in order to protect suppliers, and even in order to protect all of the levels of Government for taxes in the future...." *Id.* at 50 (statement of Professor Lawrence P. King, Chairman, Committee on Legislation, National Bankruptcy Conference).

Congress also realized that if MarAd "does not sell its assets for any reason (including further deterioration of market conditions or industrial policy considerations), the bill could result in costs rather than savings." Senate Report of the Committee on the Budget to Accompany S. 2706, 99th Cong., 2d Sess. 51 n.a (July 31, 1986). "This would occur because the government, by taking control of the asset, would forego bankruptcy protection payments to which it would otherwise be entitled and, in addition, would incur maintenance and other custodial costs from a much earlier date...." *Id.*

It thus appears that rather than reject these concerns outright, as MarAd argues, Congress took them into account by decreeing a ninety-day "grace period" and "cooling-off period" in which negotiations could occur and then allowing the district court sitting in admiralty to sell the vessel at MarAd's behest.

■ As murky as it is with respect to the triggering mechanism and its reference to a § 362 petition, the Senate Report more than adequately indicates that Congress always contemplated the scope of the exception to include the sale of one or more vessels. It states: "This section is also intended to permit district courts sitting in admiralty to distribute the proceeds from any liquidation once the stay has been lifted." Senate Report of the Committee on the Budget to Accompany S. 2706, 99th Cong., 2d Sess. at 49 (July 31, 1986). Supporting this conclusion is the testimony given at the legislative hearings prior to the revisions in July, all of which contemplate sales of vessels subject to title XI debt. *See Hearing Before the Subcomm. on Merchant Marine of the Comm. on Commerce, Science, and Transportation on S. 1992 and S. 1993*, 99th Cong., 2d Sess. 11–14 (March 21, 1986) (statement of Mr. Gaughan); *id.* at 24 (statement of Mr. Douglas); *id.* at 55 (statement of Mr. Donnelly); *id.* at 67 (statement of Mr. Waldorf).

It is in the limited recognition of debtor concerns, and in the balancing of them to reflect MarAd's needs, that lies the kernel of congressional intent reflected by S. 2706.

2. While MarAd includes, as an alternative argument, its position that its motion for assumption or rejection of the charters would satisfy the requirement that a petition be filed, if such a requirement exists, it clearly is relying on the self-executing nature of the statute, as it has been less than ninety days since MarAd brought its motion. Further, MarAd claimed at the hearing held less than 60 days after it brought its motion, that the ninety-day period had run.

3. With the exception of those authorities delegated to the Maritime Subsidy Board in § 1.67 of this title, the Maritime Administrator is delegated authority to:

....

The clarity of the language used in the technical redraft supported by MarAd suggests that the lack of clarity of § 362(b)(12) was intentional.

### IV.

With these considerations in mind, we turn to the objections raised by PLI and UMAC. They argue: (i) that § 362(b)(12) of the Code does not apply to the present case because the 90–day period has yet to commence since the Secretary of Transportation has yet to file a petition with the bankruptcy court for relief from the automatic stay; (ii) even were § 362(b)(12) applicable, the exception is not so broad as to permit the admiralty court to dispose of a vessel by either final or interlocutory sale; and (iii) only the bankruptcy court, with exclusive jurisdiction over property of the estate, may distribute the proceeds from the sale of a vessel. As discussed below, these arguments cannot be sustained.

### A. *Automatic Exception*

■ A plain reading of § 362(b)(12) indicates that, whatever its scope, it clearly applies to the present case. The involuntary petition was filed after August 1, 1986. It is now more than "90 days after the filing of" the petition under § 303 of title 11,[2] and the Maritime Administrator has been delegated the authority to carry out the Ship Mortgage Act (1920) (as amended) and the Merchant Marine Act (1936) (as amended). 49 C.F.R. § 1.66(b), (e) (1985).[3]

(b) Carry out the Merchant Marine Act, 1920, as amended (46 U.S.C. 861 *et seq.*), including the Ship Mortgage Act, 1920, as amended (46 U.S.C. 921 *et seq.*);

....

(e) Carry out the Merchant Marine Act, 1936, as amended (46 U.S.C. 1101 *et seq.*); except the authority delegated to the Administrator of the National Oceanic and Atmospheric Administration relating to the establishment of capital construction fund agreements under section 607 thereof and the granting of financing guarantees under Title XI thereof, with respect to vessels in the fishing trade or industry.
49 C.F.R. § 1.66(b), (e) (1985).

The argument that the exemption is not self-executing is mainly based on a portion of the Senate Report which, as noted above, states that a petition by the Secretary of Transportation is required. Senate Report of the Comm. on the Budget to Accompany S. 2706, 99th Cong., 2d Sess. 49 (July 31, 1986). For further support, PLI points to the legislation enacting § 362(b)(12), which refers to § 362 petitions.

However, "[s]purious use of legislative history must not swallow the legislation so as to give point to the quip that only when legislative history is doubtful do you go to the statute." Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 543 (1947). In this respect, the statutory language is unambiguous. As noted, the phrase "90 days after the filing of *such* petition", 11 U.S.C. § 362(b)(12) (emphasis added), makes clear that the ninety-day period begins to run after the filing of a petition under sections 301, 302 or 303 of the Code. Accordingly, it cannot be found that the statement in the legislative history that the Secretary of Transportation is required to file a petition with the bankruptcy court mandates that the statute be interpreted to require such a petition. In making the exception automatic upon the expiration of the ninety-day period, the statute is plain on its face. Its words control. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. at 200–01, 96 S.Ct. at 1384; *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1981); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396–97, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). A petition with the bankruptcy court for relief from the automatic stay is not required.

■ That portion of the legislation enacting § 362(b)(12) which states that § 362(b)(12) "shall apply only to petitions filed under section 362 of title 11, United States Code, which are made after August 1, 1986", H.R. 5300, 99th Cong., 2d Sess. § 5001(b) (1986), does not change that conclusion. Nowhere in the Bankruptcy Code is there any notion of a petition filed under § 362. The stay contained in § 362(a) is automatic. The other exceptions contained in § 362(b) require no request to trigger their application. Nowhere in the enacting legislation is a § 362 petition defined, nor is the contents of which suggested. It requires but little reasoning to interpret the phrase "petitions filed under section 362 of title 11" to mean petitions filed under section 301, 302, or 303 of title 11, as referred to in § 362(b) of title 11 and that § 362(b)(12) applies only to bankruptcy cases commenced after August 1, 1986 and on or before December 31, 1989. *See* H.R. 5300, 99th Cong., 2d Sess. § 5002(a), (b) (1986). To rule otherwise would be to ignore the placement of the exception in § 362(b) with other self-executing exemptions and to elevate a reference to applicability over the exception itself. If PLI's assertion were correct, one would think that the exemption would have been placed in § 362(d) where motions to modify or vacate the automatic stay are provided for, rather than in a section containing automatic exemptions.

Moreover, the same report, on which PLI relies, states: "This section makes the authority to foreclose applicable only to those bankruptcy proceedings initiated after August 1, 1986." *See* Senate Report of the Committee on the Budget to Accompany S. 2706 at 48 (July 31, 1986). Under PLI's interpretation, § 362(b)(12) would apply to any case where the Secretary of Transportation filed a so-called "362 petition" after August 1, 1986. Such an interpretation would permit retroactive application of the exception and contravene the intention that the exception apply only to newly filed cases. *See id.* at 48, 51 n.a ("Section 302 would enable the Maritime Administration to take possession (and title) to a vessel that has defaulted on its loans to the agency and declares bankruptcy after August 1, 1986").

■ In reaching that conclusion, we are mindful that it, when coupled with the congressional intention of a ninety-day grace period, points to the further conclusion that § 362(b)(12) is to be interpreted to apply

only to those instances where MarAd has commenced a foreclosure proceeding pre-petition, notwithstanding the indication from the statute's use of the term "commencement" that MarAd might bring such an action post-petition. If the exemption applied to cases where the debtor's default on MarAd obligations occurred post-petition, the grace period would, *a fortiori,* be less than ninety days given the self-executing language of the statute whereby the automatic stay is terminated at the end of the ninetieth day.

But such a conclusion is consistent with the insertion of the "which was brought by the Secretary" language to describe the type of action that would become exempt after the passage of ninety days. That language, together with the statute's clear indication that the ninety-day period begins to run from the filing of a petition under 11 U.S.C. § 301, 302, or 303, strongly implies that it was contemplated that the statute was designed to exempt pre-petition actions brought by the secretary, as is the case here.[4]

## B. *Sale of Vessels*

■ We also must reject the assertion that § 362(b)(12) cannot be interpreted to

permit a foreclosure sale of a vessel either interlocutory or after entry of a final judgment. While the placement of the "including distribution of any proceeds of sale" words in the final draft of § 362(b)(12) is awkward, they can only mean that a vessel can be sold and the proceeds can be distributed. The legislative history strongly demonstrates that Congress sought to accomplish the reduction of spending on title XI guarantees through the sale of vessels and the distribution of their proceeds.

The claim that interlocutory sales are to be distinguished is without merit. Congress made no such distinction either in the statute or the legislative history for the obvious reason that interlocutory sales would further the purpose of the amendment by enabling the secretary to realize on the government's collateral at an earlier date and thus further reduce government spending. When Congress included the words "conclusion to the entry of final judgment", it necessarily built in a reference to the admiralty rules. Rule E(9) of the Supplemental Rules for Certain Admiralty and Maritime Claims authorizes interlocutory and final judgment sales.[5]

---

**4.** While such a reading does not recognize the use of the term "commencement," perhaps this highly confusing use of the words "commencement" and "which was brought" can be harmonized in a manner that is consistent with the full ninety-day grace period that Congress intended. Such harmonization might be reached by reasoning, as MarAd must have been aware when its "redraft" was not fully accepted, that the exemption applies only to pre-petition defaults. While such a construction would modify slightly the "which was brought" language, it would honor somewhat the "commencement" term and reflect the legislative history. That interpretation, moreover, would not place undue weight on the term "commencement", which was already in the draft at the time "was brought" was added and must, therefore, have been intended to modify.

That harmonization would also be consistent with the notion that Congress apparently sought to strike a fair balance between MarAd's concern that frivolous Chapter 11 petitions would be brought merely to retain certain tax credits by companies with no demonstrable ability to reorganize and the concern of others that foreclosure and sale of vessels of a debtor, who otherwise has the potential to reorganize, would

deprive it of its major assets and thereby destroy the viability of any attempt to reorganize. While that balance will not prevent every abuse of Chapter 11, it appears designed to minimize abuses and leave viable maritime debtors with the potential to reorganize. Where the default occurs after filing, the secretary is still entitled to adequate protection of his collateral or, if "the debtor does not have an equity in such property ... and ... such property is not necessary to an effective reorganization", relief from the stay. 11 U.S.C. § 362(d)(2).

**5.** Rule E(9)(b) provides:

*Interlocutory Sales.* If property that has been attached or arrested is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expenses of keeping the property is excessive or disproportionate, or if there is unreasonable delay in securing the release of property, the court, on application of any party or of the marshal, may order the property or any portion thereof to be sold; and the proceeds, or so much thereof as shall be adequate to satisfy any judgment, may be ordered brought into court to abide the event of the

The amendment is thus to be interpreted to permit an interlocutory sale when such a sale is permissible under the principles of admiralty law. Vessels are often subject "to deterioration, decay, or injury by being detained in custody pending the action" and, in such instances, interlocutory sales are appropriate if a sufficient bond is not posted. Fed.R.Civ.P., Supplemental Rule for Certain Admiralty and Maritime Claims (E)(9)(b); *see Merchants National Bank of Mobile v. Dredge General G.L. Gillespie*, 663 F.2d 1338, 1342 (5th Cir.1981) (court affirmed interlocutory sale of vessels seized pursuant to foreclosure of preferred ship mortgages where trier of fact found: "engine(s) might rust and freeze up, necessitating costly overhaul[,] ... electrical equipment of the vessels was susceptible to corrosion, rust and general deterioration ... [and] hulls of all of the vessels and most of the superstructures were subject to rusting, and had not been properly painted."), *cert. dismissed*, 456 U.S. 966, 102 S.Ct. 2663, 72 L.Ed.2d 865 (1982).

### C. *Jurisdiction*

Such a construction, moreover, does not, as PLI urges, amount to a partial *de facto* repeal of 28 U.S.C. § 1334(d) which provides the district court in which a bankruptcy case is commenced or pending with exclusive jurisdiction "of all of the property, wherever located, of the debtor as of the commencement of such case, and of the estate." *See supra* note 1. Although the filing of "the petition for reorganization [withdraws] jurisdiction from the admiralty court and [lodges] it exclusively in the district court—'the court where the Title 11 proceeding [is] pending'", and the "bankruptcy court [inherits] that jurisdiction when the district court [refers] the case to it under 28 U.S.C.A. § 157(a)," *Slay Warehousing Co. v. Modern Boats, Inc. (In re Modern Boats, Inc.)*, 775 F.2d 619 (5th Cir.1985), the vacatur of the automatic stay revests the admiralty

court with jurisdiction to foreclose the debtor's interests. Upon sale, the rights of a debtor to a vessel are extinguished. What remains are the proceeds to be distributed. As to that, § 362(b)(12) permits the admiralty court, in light of its specialized nature and expertise, *cf. Gary Aircraft Corp. v. United States (In re Gary Aircraft Corp.)*, 698 F.2d 775, 783–84 (5th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983), to rank maritime liens, hold a sale of a vessel when appropriate under principles of maritime law and distribute the proceeds of such a sale only to maritime lien claimants and the holders of valid ship mortgages and security interests. Any surplus after such distribution is to be turned over to the bankruptcy estate for distribution by the bankruptcy court. *See* G. Gilmore & C. Black, *The Law of Admiralty* § 9–85, at 788 (2d ed. 1975).

### V.

The foregoing constitutes this Court's findings of fact and conclusions of law. Because the automatic stay does not apply to the actions against the Chartered Vessels, PLI has failed to demonstrate cognizable and irreparable injury, *see In re Beker Industries Corp.*, 57 B.R. at 623, and a likelihood of success on the merits. PLI's motion for a preliminary injunction enjoining MarAd from selling either of the vessels chartered by PLI must be and is denied. The surplus, if any, from the admiralty court's sale of the Chartered Vessels, after its distribution of proceeds to claimants with valid maritime liens, ship mortgages and security interests pertaining to those vessels, is to be returned to this Court for distribution.

IT IS SO ORDERED.

---

action; or the court may, on motion of the defendant or claimant, order delivery of the property to him, upon the giving of security in accordance with these rules.

Fed.R.Civ.P., Supplemental Rule for Certain Admiralty and Maritime Claims E(9)(b).