**In re McLEAN INDUSTRIES, et al., Debtors.**

**Bankruptcy No. 86 B 12238–41.**

United States Bankruptcy Court, S.D. New York.

June 10, 1987.

See also, Bkrtcy., 70 B.R. 852.

Milbank, Tweed, Hadley & McCloy by John J. Jerome, Alan W. Kornberg, Stephen Shimshack, New York City, for Debtors.

Gilmartin, Poster & Shafto by Robert L. Poster, New York City, for debtors.

Rudolph W. Guiliani, U.S. Atty., S.D. N.Y., by James L. Garrity, Jr., New York City, U.S. Dept. of Transp., Maritime Admin. by Richard M. Lorr, Div. of Ship Financing Contracts, Office of Chief Counsel, Washington, D.C., for Maritime Admin.

Cadwalader, Wickersham & Taft by William S. Busch, Theodore A. Ulrich, New York City, for Bank of America and Citibank.

Wachtell, Lipton, Rosen & Katz by Chaim Fortgang, Scott K. Charles, New

York City, for Bank of America and Citibank.

Dickstein, Shapiro & Morin by Barry Wm. Levine, Ira R. Mitzner, New York City, for the MEBA Benefit Plans.

Proskauer Rose Goetz & Mendelsohn by Alan B. Hyman, Richard Mashbeg, Esq. for MEBA Pension Trust, MNU Pension and Welfare Plan, MM & P Health and Benefit Plan, ARA Pension and Welfare Plan, and ROU Benefit Plan.

White & Case by Allan Gropper, James P. Laughlin, New York City, for the Unsecured Creditors Committee.

Hahn & Hessen by Jeffrey L. Schwartz, New York City, for Daewoo Corp.

Burke & Parsons by Thomas A. Dillon, Jr., New York City, for Daewoo Corp.

Weil, Gotshal & Manges by Corinne Ball, New York City, for the Prudential Ins. Co. of America.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Before us is a motion for approval of a settlement whereby the automatic stay would be vacated in favor of certain secured creditors with respect to four vessels sailing under the flag of the United States that have been arrested in foreign ports. It is requested that the secured creditors not be required to petition those courts to recognize and give effect to United States law barring transfers of vessels to non-American entities. This involves considerations of extraterritorial application of our statutes, the interplay of bankruptcy and admiralty statutes in the context of the bankruptcy of a maritime company and an examination of what Congress "would have wished" and done, *see Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.*, 423 U.S. 1918, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), had it considered the issue.

## I.

The debtor, United States Lines ("U.S. Lines"), commenced its Chapter 11 case, 11 U.S.C. §§ 1101 *et seq.* (1986) (the "Bankruptcy Code"), on November 24, 1986. The case is being jointly administered with three other cases. Property of the estate includes twelve exceptionally large vessels called "Econships" which were put in service in the early 1980's. Designed to transport a large volume of goods packed in containers, the Econships thus allow for economies of scale and the elimination of intermediate packaging costs in an overseas shipping service providing on-land pickup and delivery. According to the United States Maritime Administration ("MarAd"), the Econships are the largest, most fuel efficient, modern and competitive container ships under the U.S. flag. (MarAd brief at 4–5). Constructed pursuant to § 615 of the Merchant Marine Act of 1936, 46 U.S.C. § 1101 et seq. (1975), the vessels, according to MarAd, presently constitute 23% of the U.S. flag commercial fleet capacity to carry containers and some 15% of the militarily useful deadweight tonnage of the privately owned U.S. general cargo fleet. MarAd has declared these vessels to be essential for the national security interests because of their large sealift capacity (Affidavit of Gregory S. Dole at 3; Affidavit of Robert J. Patton, Jr. at 5). As such, the vessels are included in government assessments of projected sealift capacity to meet a hypothetical wartime demand in 1990 (MarAd brief at 5).

### A. *The Bank Debt Regarding the Econships*

The Econships are apparently the subject of several preferred ship mortgages. Primary among them are first preferred ship mortgages, security interests and liens granted to Bank of America National Trust and Savings Association and Citibank, N.A. (collectively the "Banks") as mortgagees and trustees to secure repayment of a standby letter of credit facility dated April 12, 1983, as amended between U.S. Lines and several banks, of which $154 million has been drawn down. The Econships are also subject to: (i) second preferred ship mortgages granted to Bankers Trust Co. as trustee-mortgagee for Daewoo Corporation, Daewoo Shipbuilding & Heavy Ma-

chinery Ltd. (jointly "Daewoo") and Asia Pacific Capital Corp.; (ii) third preferred ship mortgages granted to United States Trust Co. as trustee-mortgagee for General Electric Credit Capital Corp. and the Prudential Insurance Company of America ("Prudential") and (iii) fourth preferred ship mortgages granted to Prudential.

During the course of these bankruptcy proceedings, the Court has entered orders on consent of the Banks permitting the debtor to use cash collateral claimed by the Banks, the ownership of which the debtor disputes. The money was apparently used, in part, to preserve and maintain the Econships and other collateral of the Banks.

### B. *Foreign Arrests of the Econships, Entry of Orders Permitting the Banks to Appear at those Proceedings*

While eight of the Econships have returned to United States ports, the remaining four were arrested in Singapore and Hong Kong in December 1986 and January 1987 pursuant to arrest warrants issued by those courts notwithstanding the automatic stay provided by § 362(a) of the Bankruptcy Code. Upon applications of the Banks and it being uncontested that the prospective sale of those four ships by foreign admiralty courts could eliminate their first preferred mortgages, this Court entered orders with respect to each of the four Econships permitting the Banks to appear in those foreign arrest proceedings in order to protect their interest therein.

The affidavits and testimony of both Singapore and Hong Kong counsel attest to the substantial similarity between these two jurisdictions in the aspects of admiralty law and practice material to this motion. A party with an *in rem* claim against a vessel can commence an *in rem* action, enter a Caveat against Release and Payment out ("caveat") in an existing arrest proceeding and intervene in the arrest proceeding. If the party commences his own *in rem* proceeding, he can then cause the vessel to be arrested even if it has previously been arrested by another party. Nei-

ther entry of a caveat nor request to intervene requires an additional arrest warrant. A caveat, once entered, has the effect of holding the vessel if the vessel is released from the previous arrest pending further arrest by the caveator. Once the vessel is released, a caveator is given a brief period in which to cause his own writ of summons and warrant of arrest to be served with respect to his *in rem* claim. Intervention in a pending arrest proceeding entitles the intervenor to oppose the arresting party's claim and to participate in sales procedures. In order to collect on the proceeds from the sale of the vessel, each caveator must commence a separate *in rem* proceeding and obtain judgment. Service of a summons is sufficient; no arrest is required. The proceeds of the sale of the vessel are distributed in accordance with the priority established by local admiralty law.

The AMERICAN OKLAHOMA was arrested in Singapore on December 8, 1986 at the instance of two claimants: (i) Frisol Bunkering B.V. claiming $235,841.08 for the price of bunkers allegedly supplied to this vessel on November 7, 1986, at the port of Rotterdam, and (ii) GAC Marine Fuels Limited ("GAC"), claiming $69,500 for the price of bunkers allegedly supplied to a sister ship.

The AMERICAN CALIFORNIA was first arrested in Hong Kong on December 9, 1986 at the instance of GAC which claimed $173,750 for the cost of bunkers supplied to another sister ship. Almost concurrently, another creditor caused the issuance of an additional writ and warrant of arrest against the vessel, but due to the prior arrest on behalf of GAC, the second arrest was not effected.

By motion dated December 11, 1986, and on consent of the debtor, Bank of America sought an order pursuant to § 362(f) from this Court lifting the stay in order to allow the Bank to "appear and participate in pending maritime arrest proceedings" regarding the AMERICAN OKLAHOMA and the AMERICAN CALIFORNIA and in all other proceedings in which the Econships

were arrested.[1] In entering the order on December 11, 1986 (the "December 11 Order"), this Court, however, limited it to the two proceedings then pending and added the following provision:

> Nothing in this order approves or condones the commencement of the Arrest Proceedings. The jurisdictions in which they were commenced should recognize and grant comity to these bankruptcy proceedings and the stay ordered by this Court on November 24, 1986 and provided by 11 U.S.C. § 362. *Cunard Steamship Company Ltd. v. Salen Reefer Services A.B.*, 773 F.2d 452 (2d Cir.1985).

The December 11 Order provided for the payment of wage related claims and repatriation costs with respect to the crews of those vessels, and it further provided that, with respect to such payments, the Banks would be subrograted to the rights and priorities of those paid, and their first preferred ship mortgages would be deemed increased by that amount. Significantly, the Order further limited the relief from the automatic stay to the two foreign arrest proceedings, stating:

> With respect to each of the Vessels subject to Arrest Proceedings as described in the Motion (the "Arrest Proceedings"), the automatic stay imposed by Section 362(a) of the Bankruptcy Code hereby is modified to permit Bank of America, Citibank and the Banks and their respective attorneys and agents to appear, participate in and take all other steps which they may deem necessary to protect their interests and enforce their rights in the Arrest Proceedings.

The order accordingly decreed that the automatic stay would otherwise remain "in full force and effect" and that the modification would terminate with respect to each vessel if all arrest proceedings pertaining to that vessel were discontinued in 30 days.[2]

After entry of the December 11 Order, Bank of America intervened in the AMERICAN OKLAHOMA arrest proceedings in Singapore. Its Hong Kong counsel caused a caveat to be entered against the AMERICAN CALIFORNIA on December 31, 1986 in the Hong Kong arrest proceeding for the sum of $154,156,319; by order of that court dated January 20, 1987, counsel was granted leave to intervene. Frisol Bunkering B.V., one of the arresting parties, released the AMERICAN OKLAHOMA from arrest on December 23, 1986, and on December 31, 1986 discontinued its *in rem* action. GAC/FAL Bunkering Co., Ltd. has, however, maintained its arrest.

Singapore counsel to the Banks apparently misunderstood the substance of this Court's December 11 Order. While the Order merely allowed the Banks to appear in and take all steps necessary to protect themselves in the Singapore arrest proceeding, the Banks' counsel was under the impression that "Bank of America obtained the leave of this Honorable Court to initiate proceedings and take all necessary steps in order to protect their interest and preserve their securities in the AMERICAN OKLAHOMA." Accordingly, he commenced, on January 19, 1987, a separate Admiralty *in rem* proceeding against the AMERICAN OKLAHOMA, claiming the sums of $154,156,319 and $16,474 and caused the vessel to be arrested on January 22, 1987.

Hong Kong counsel for Bank of America was of the same erroneous belief as the Banks' Singapore counsel. On March 6, 1987, he commenced separate *in rem* proceedings against the AMERICAN CALI-

---

1. The motion papers supporting the Banks' application for the orders and the affidavits of foreign counsel are inconsistent as to the dates of foreign arrests of the four Econships. For purposes of this opinion, however, the discrepancies are not material.

2. The meaning of the December 11 Order is perfectly clear and was clear to the Court when it signed that Order. It limited the Banks' actions to the then existing arrest proceedings. As applied to admiralty practice in Singapore and Hong Kong, it would permit the Banks only to intervene and enter caveats. Perhaps, since it is necessary to reduce a caveated claim to judgment in a separate *in rem* proceeding the December 11 Order could be interpreted to permit the commencement of an *in rem* proceeding claim so long as a vessel was arrested by another creditor. In no way can the December 11 Order be interpreted to permit an arrest of any Econship by the Banks or any one else.

FORNIA for the same amounts as had Singapore counsel. The writ was served on solicitors for the debtor on March 10, 1987; no acknowledgement of service was filed by the debtor. The Banks assert that, in accordance with the rules of the Supreme Court of Hong Kong, Bank of America may apply by motion for judgment in default against the vessel, enforcement of which would be limited to the *res* or its proceeds, not *in personam* against the debtor.

Substantially similar courses of action were taken with respect to the AMERICAN NEW JERSEY and the AMERICAN NEW YORK except that the only arresting party of the AMERICAN NEW YORK is not an alien but one of the Banks.

As to the AMERICAN NEW JERSEY, it was arrested in Singapore by warrant issued at the instance of Transol Bunker B.V. on December 15, 1986. Two days later, on December 17, 1986, upon the consent of the debtor and the creditors committee, the Banks requested this Court to enter an order with respect to the AMERICAN NEW JERSEY similar to the December 11 Order. Such an order was entered on the same day, and an amended order was entered on December 23rd. In all respects relevant to this motion, those orders were identical to the December 11 Order.

Notwithstanding the Order's limitation to action within local arrest proceedings, Bank of America first intervened and then commenced, on January 19, 1987, an Admiralty *in rem* action against and caused the arrest of the AMERICAN NEW JERSEY, claiming the same sums of $154,156,319 and $16,474.

The AMERICAN NEW YORK was similarly arrested on December 29, 1986 in Singapore by owners of cargo laden on board the ship. At the request of the Banks and with the consent of the debtor and the creditors committee, this Court, on January 9, 1987, entered an order identical in form to prior orders modifying the automatic stay to permit the Banks to appear and take steps in that arrest proceeding. Accordingly, Citibank's New York counsel instructed Singapore counsel to file a caveat and intervene. But after being given leave by the Singapore court to intervene and commence an *in rem* proceeding, Singapore counsel caused the AMERICAN NEW YORK to be arrested on January 22, 1987.

The original arresting party of the AMERICAN NEW YORK (Middle East Cargo Consignees) released the vessel from arrest on February 14, 1987. The list of claimants reproduced by Singapore counsel states that its claim was barred by a statute of limitations. Citibank, however, has maintained its arrest against the vessel, and on March 20, 1987, it filed an application by way of notice of motion seeking an appraisement and sale *pendente lite* of the AMERICAN NEW YORK, to be heard in conjunction with similar motions made by others with respect to the AMERICAN NEW JERSEY and the AMERICAN OKLAHOMA.

On the ultimate return date of those motions, MarAd appeared through Singapore solicitors and argued that the Singapore court should recognize the prohibitions of Section 9, of the Shipping Act, 46 U.S.C. § 808 (West Supp.1987) ("Section 9") and should restrict the sales of the vessels to American bidders. The Singapore court tentatively refused to do so. The Honorable Judge stated that he would review MarAd's position after the bidding was concluded and reserve approval of the sale should the highest bidder at auction be a non-American. He added that if the highest bid for a vessel is from a non-American, and the second highest bid is from an American, then as long as the difference between the two bids is marginal, he might exercise his discretion to sell the vessel to the American bidder.

Similarly, a sale *pendente lite* of the AMERICAN CALIFORNIA is pending in the Hong Kong proceeding. At the hearing on a motion for appraisal and sale *pendente lite* at which MarAd appeared, the Honorable Judge expressed "considerable reservations" regarding MarAd's request that Section 9 be recognized and the sale limited to American buyers. It was

then decided to sell the vessel subject to final approval by the court, with any party being free to apply on two days' notice to obtain such approval.

It appears that the principal claims asserted in the Singapore and Hong Kong arrest proceedings are those of the Banks. Other filed claims total approximately $2.9 million regarding the AMERICAN OKLAHOMA, $1.4 million on the AMERICAN NEW JERSEY, and approximately $1.5 million on the AMERICAN CALIFORNIA.

### C. *The Settlement and Objections*

By its instant application pursuant to Rule 9019 of the Rules of Bankruptcy Procedure, the debtor seeks to settle its disputes with the Banks, including the dispute over the ownership of cash collateral and the debtor's potential claims against the Banks under 11 U.S.C. § 506(c). The principal terms of the settlement are that the Banks lend the debtor $4 million on a nonadministrative priority basis secured by their mortgages; they waive other administrative priority claims including claims for use of cash collateral; the debtor waive its claims under §§ 506(c) and 552 of the Bankruptcy Code; junior mortgages be subordinated to those of the Banks; and the automatic stay be vacated unconditionally with respect to the Econships and other collateral in order to enable the Banks to exercise their rights and remedies as they may determine in their discretion. The Banks have stated that they will not enter into the settlement unless each of these conditions is met.

The motion has sparked several objections. Among them are Daewoo's contention that the Court should not determine its ultimate position, and MarAd's contention that the Banks violated the automatic stay by seeking affirmative relief against the four Econships in Singapore and Hong Kong. More significantly, MarAd strongly contends that this Court should not unconditionally vacate the automatic stay but should condition relief upon compliance with Section 9. District No. 1–Pacific Coast District, Marine Engineers' Beneficial Association (AFL–CIO) ("MEBA") and

various union pension funds also oppose transfer of the vessels except in compliance with Section 9. They further contend that for the Court to approve a settlement whereby the debtor would permit the vessels to be foreclosed on without retaining the Econships in U.S. registry would violate their collective bargaining agreement with the debtor and give rise to huge administrative claims.

In response, the Banks, by order to show cause returnable at the same time, have brought on an alternative motion for an order vacating the automatic stay. It has been agreed that the automatic stay be modified to permit the Banks to commence admiralty proceedings as against the eight Econships in U.S. ports and that the proceeds are subject to further order of this Court regarding certain matters. It has also been agreed that the Court, at this stage, should consider only the Section 9 issue raised by MarAd in opposition to the debtor's request for approval of its settlement with the Banks. If the Court declines to vacate the automatic stay unconditionally in favor of the Banks with respect to the four Econships arrested abroad, the settlement will fall.

### II.

Section 9 provides, in pertinent part: it shall be unlawful, without the approval of the Secretary of Transportation, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States.

46 U.S.C. § 808. As structured by the argument at the final hearing on the motion, applicability of Section 9 depends on resolution of: (i) whether Congress, if it had thought of the issue, would have required compliance with Section 9 even in

foreign admiralty court proceedings, and (ii) whether the court should, because of the circumstances of this case, only modify the automatic stay consistent with Section 9. Subsumed within these issues is the issue of whether Section 9 applies to foreign admiralty court sales of U.S.-flag vessels at least to the extent that Congress expected foreign courts to grant comity to Section 9 and U.S. trustees-mortgagees to request that they do so. If Section 9 does not apply, then it can be fairly said that Congress would not have enacted such a condition to orders granting relief from the automatic stay.

## III.

Accordingly, we turn to the issue of whether Section 9 applies to foreign admiralty foreclosure sales. In claiming that the automatic stay should be terminated rather than modified, the Banks and the debtor assert that Section 9 is not extraterritorial. In this, they rely principally on *Hartwig v. United States (THE CHIQUITA),* 19 F.2d 417 (5th Cir.1927). In that case, a vessel flying the Honduran flag was seized on the high seas for carrying illegal cargo and was libelled as an American vessel on the ground that she had originally been of American registry and was transferred to an alien without the consent required by a prior version of Section 9. In reversing the judgment of foreclosure, the court observed that the ship had been seized at Nassau, Bahamas and sold to an alien pursuant to admiralty process. Enforcing the conclusive nature of admiralty sales as against the world, the court held that judgment divesting the vessel of American ownership was not open to collateral attack in another court. 19 F.2d at 418. To this it added the *obiter dicta* that the former version Section 9 was "not extraterritorial authority." *Ibid.*

### A. *Legislative Intent*

In 1938, however, Section 9 was amended. When considered by *THE CHIQUITA* court, the statute had made it "unlawful to sell, transfer or mortgage any [U.S.] vessel...." To these terms, the 1938 amendment added, *inter alia,* the phrase "or in

any manner transfer". Act of June 23, 1938, c. 600, § 42, 52 Stat. 964 (1938). By this addition Congress intended to bar evasion in all cases. The House Report stated:

> As the section is worded in the present law, it may be possible for an owner to surrender the documents of the vessel or arrange to have them surrendered and sell the vessel to an alien, without first securing the consent of the Commission. The amendment is designed to prevent possible evasions and to secure the permission of the Commission in all cases of transfer to foreign registry.

H.R.Rep. No. 2168, 75th Cong., 3rd Sess. 27 (1938).

That intention is confirmed by the Senate Report dealing with the amendments to Section 9 in 1965, Pub.L. No. 89–346, 79 Stat. 1305 (1965). The purpose of Section 9 since 1920 has been to protect the national defense and promote United States foreign and domestic commerce by having "a merchant marine sufficient to carry the greater part of its commerce and serve as a naval or military auxiliary in time of national emergency, ultimately to be owned and privately operated by citizens of the United States." *Meacham Corp. v. United States,* 207 F.2d 535, 542 (4th Cir.1953). In considering the 1965 amendment (whereby foreign citizens were permitted to be beneficiaries of a trust indenture held by a U.S. citizen as mortgagee/trustee) the Senate Report noted witnesses' concern that the adoption of the amendment permitting foreign beneficial ownership would defeat the purpose of Section 9. The report added that MarAd's general counsel had responded to those concerns by testifying:

> sections 9 and 37 of the Shipping Act, 1916, specifically prohibit any U.S.-flag vessel being transferred to an alien or noncitizen without the approval of the Maritime Administration and that therefore there was no problem regarding the loss of U.S.-flag vessels when bonds are held by noncitizens. The General Counsel added that the statutory prohibition in its present form is sufficiently broad and applies to the sale of any U.S. vessel regardless of whether any bond financ-

ing is involved or whether a noncitizen holds any bonds and is effectively enforced by the Justice Department in foreign courts as well as U.S. courts.

In regard to the question of foreign control by operation of U.S.-flag vessels by the trustee under the trust indenture or mortgage, the General Counsel of the Maritime Administration testified that this was improbable because any bondholder advised by a responsible trustee will upon default direct the trustee to foreclose and sell the ship through court action to a U.S. citizen as required by law rather than operate the vessel and endanger his security or subject the trustee and/or bondholders to the penal provisions of the 1916 Act.

S.Rep. No. 686, 89th Cong., 1st Sess. 4 (1965); *see also Hearing Before the Subcomm. on Merchant Marine and Fisheries of the Comm. on Commerce,* 89th Cong., 1st Sess. 87 (1965) (statement of Carl C. Davis, General Counsel, MarAd). Further comfort was given by the general counsel to MarAd who stated that the trustees-mortgagees were expected to comply by requesting comity in foreign courts:

if the mortgage is in default and the trustee forecloses in a foreign court, he is obligated to request the foreign court to follow the U.S. law and sell the vessel only to a citizen of the United States.

*Id.* p. 81. Accordingly, the Commerce Department, expressly responding to a request by Representative Bonner, Chairman of the Subcommittee on Merchant Marine and Fisheries, observed that the prohibition is to be enforced abroad and therefore that no further protections are necessary. The acting general counsel wrote:

In view of the provisions of sections 9 and 37 restricting the sale on charter of ships to noncitizens without approval and the provisions of the 1920 act restricting

the sale of vessels by district courts on foreclosure to citizens, further restrictions in respect of these matters are not needed. These provisions and the effect given to them in connection with in rem actions against American-flag ships in foreign courts have been effective in retaining control of these ships.

H.R.Rep. No. 1116, 89th Cong., 1st Sess. 10 (1965), U.S.Code Cong. & Admin.News 1965, pp. 4231, 4240.[3]

■ The question of extraterritorial application is, in the final analysis, a question of legislative intention. Legislative power is not constrained by international law. *E.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937–38, 11 L.Ed.2d 804 (1964); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963); *Brown v. United States,* 12 U.S. (8 Cranch) 110, 127, 3 L.Ed. 504 (1814). Interpretation of statutes to determine their extraterritorial application, however, raises international law concerns, for it is not to be generally inferred that Congress acted in a fashion contrary to international law or without regard to U.S. relations with other countries. *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (2d Cir.1945); *see also* Oppenheim, 1 *International Law* 41 (8th ed. H. Lauterpacht 1955); Sprout, *Theories as to the Applicability of International Law in the Federal Courts of the United States,* 26 Am.J.Int'l L. 280 (1932); Dickinson, *The Law of Nations as Part of the National Law of the United States,* 101 U.Pa.L.Rev. 26 (1952). It is usually presumed that economic regulation "is meant to apply only within the United States." *Foley Bros., Inc. v. Filardo,* 336

---

**3.** The value of subsequent legislative history is not disputed on this motion. It can be a guide as to congressional intention. *See Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969); *In re Lion Capital Group,* 44 B.R. 684, 11 C.B.C.2d 671 (Bankr. S.D.N.Y.1984). It is of added significance here in addressing the issue of whether Congress

would have wished orders granting relief from the automatic stay to require compliance with Section 9, especially in view of its relatively recent vintage and, more importantly, the lack of legislative history subsequent to that generated in 1965 indicating any intention by Congress of changing its mind or waivering in its determination.

U.S. 281, 285, 69 S.Ct. 575, 577–78, 93 L.Ed. 680 (1949); *accord American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). International shipping, however, raises its own concerns beyond economic regulation and has its own statutory history:

> The shipping laws of the United States, set forth in Title 46 of the United States Code, comprise a patchwork of separate enactments, some tracing far back in our history and many designed for particular emergencies. While some have been specific in application to foreign shipping and others being confined to American shipping, many give no evidence that Congress addressed itself to their foreign application and are in general terms which leave their application to be judicially determined from context and circumstances. By usage as old as the Nation, such statutes have been construed to apply only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law.

*Lauritzen v. Larsen*, 345 U.S. 571, 577, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953). Consequently, United States statutes will not be construed as applying to the extraterritorial acts of non-U.S. citizens unless no other construction is permitted. *Id.* at 577, 73 S.Ct. at 925–26.

■ *Lauritzen*, *McCulloch* and *Benz v. Compania Naviera Hidalgo S.A.*, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), concerned the application of the Jones Act and U.S. labor laws to the relationship between foreign ships and their foreign seamen where Congress had expressed no intention to do so. This case, unlike those cases, involves the scope of prohibitions on American trustee-mortgagees who would foreclose preferred ship mortgages in a foreign admiralty court in arrest proceedings commenced by foreigners, and where, in one of those proceedings, an American trustee-mortagee is currently the only arresting party.

As noted, the present case involves a statute of general application that Congress amended in 1938 for the express purpose of preventing evasion in all cases. It is uncertain whether Congress had in mind either the statute's applicability to a foreign arrest proceeding commenced by foreigners or the danger to a ship trustee-mortgagee arising from the consequent expungement of its preferred ship mortgage from a sale of the mortgaged vessel. Nevertheless, the 1938 statutory language is embracive, and the 1965 legislative history amply demonstrates that Congress intended the statute to cover foreign arrest proceedings, at least to the extent that it expected U.S. trustee-mortgages to request comity and foreign courts to recognize and give effect to Section 9.

Not to the contrary is Hackworth, II *Digest of International Law* 768–69 (Dept. of State 1941), upon which the Banks rely. There reported are instances where the executive branch, like the court in *THE CHIQUITA*, recognized a foreign foreclosure in a subsequent arrest. The instances referred to pre-date the 1938 amendment and concern the desirability of subsequent recognition of an admiralty court sale rather than permitting such a sale in the first place.

Of more substance is the Banks' claim that the instant statute is to be read consistently with its integrated sister statute, the Ship Mortgage Act. *See Blue Chip Stamps v. Manor Drug Stores, Inc.*, 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Section 961(a) of the Ship Mortgage Act precludes the unauthorized surrender of vessel documents covered by a preferred ship mortgage "except in the case of forfeiture of the vessel or its sale by the order of any court of the United States or any foreign country." 46 U.S.C. § 961 (1975). Section 961(f) provides that "no vessel of the United States may be sold by order of a district court of the United States in any suit in rem in admiralty to any person not a citizen of the United States." From this the Banks draw the inference that Congress did not intend Section 9 to apply to foreign foreclosure proceedings.

All that we are able to draw from this section of the Ship Mortgage Act, however,

is that Congress could obviously enact no proscription of the power of a foreign court. The Section 9 issue is addressed in the legislative history to Section 9 where Congress expressed the intention that Section 9 did apply to foreign foreclosure proceedings and that foreign courts would give the comity that MarAd had experienced in recent years. As the Fourth Circuit observed in *Chemical Bank New York Trust Co. v. Steamship Westhampton*, 358 F.2d 574 (4th Cir.), *cert. denied*, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1965):

> It is beyond question that the possibility of alien control was of vital concern to Congress, but the legislation primarily designed to meet that evil was found in the Shipping Act, rather than the Ship Mortgage Act. Questions of alien control should be fought out under these statutory provisions where the Secretary of Commerce, acting through the Maritime Administration, is granted the discretion to approve or condemn the control sought in a particular case.

358 F.2d at 581.

We thus conclude that Congress intended Section 9 to be enforced extraterritorially to the extent possible at least prior to entry of a final judgment by a foreign court, that it expects comity to be given by foreign courts at MarAd's behest, and that it expects U.S. trustee-mortgagees to request the same and not to solicit foreign buyers.[4] A less restrictive reading could sharply and adversely affect the military needs and general commercial purposes that Congress sought to achieve through the Shipping Act.

## B. *International Law Considerations*

This congressional intention is sufficiently clear so that it might prevail over international law concerns. We need not reach that issue, however, for the extraterritorial application of Section 9, at least to the degree concluded above, does not conflict with international law. Unlike *Lauritzen, Benz,* and *McCulloch*, this case does not concern the relationship of non-U.S. citizens to non-U.S. ships. Rather, it concerns the relationship of U.S. trustee-mortgagees to four U.S.-flag ships. Thus, in international law terms, the issue is one of regulating the extraterritorial acts of U.S. citizens. Such is expressly permitted by international law. *The Restatement (Second) of Foreign Relations Law* § 30 (1965) (the "*Restatement*").

Secondly, given the directly adverse consequences to the perceived military needs of the United States, requiring trustee-mortgagees to request comity in foreign courts is easily justified by the effect principle expressed in Section 18 of the *Restatement:*

> A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if ... (b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

To be applied with caution, *see* Jennings, *Report of the International Law Governing Antitrust Jurisdiction Fifty-First Conference*, 354–55 (ILA 1964), the effect principle requires not just a general effect, *Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 989; *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir.1972), but rather an effect of

4. In so concluding, we make no determination of the applicability of Section 9 after an admiralty court foreclosure sale has occurred. That issue involves determination of whether Congress intended to limit the preclusive effect of such a sale, thereby legislatively overruling the precise holding of *THE CHIQUITA.* We need not reach that issue for what is presented here is whether Congress would have conditioned relief from the automatic stay upon compliance with Section 9 to permit such a sale of a U.S.-flag vessel that is estate property. Since the automatic stay bars arrest and sale absent such relief, the issue arises, as here, prior to an admiralty court sale taking place. Consequently, the effect of such a sale having occurred is not before us.

the type sought to be prevented. *See, e.g.,* *Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1910); *Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.), *rev'd on other grounds,* 405 F.2d 215 (2d Cir.1968) (en banc), *cert. denied sub nom. Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 105–06 (2d Cir.1951).

Since Section 9 by its terms covers all transfers foreign and domestic, the substantial and direct effect of permitting the Banks to act in their unfettered discretion as they request would be the likely removal of four vessels from U.S. registry, to the detriment of the very purposes sought to be achieved by the statute. Moreover, from the statements of MarAd counsel before Congress in 1965, noted above, the rule, Section 9, has been recognized by foreign courts at MarAd's instance. In the only reported case called to our attention, the High Court of Judicature at Bombay, India entered a consensual order directing that prospective bidders at an admiralty court sale be either U.S. citizens or buyers approved by MarAd. *Argo Marine Supply Co., Inc. v. Steamship Easthampton,* 1965 A.M.C. 147 (1965). Thus, the statute has extraterritorial effect under § 18 of the Restatement and to hold so is not "inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems."

In this light, the claim advanced by Daewoo that the statute is penal in nature and therefore cannot be applied extraterritorially is of no merit. While Congress has attached penal consequences to a violation of Section 9, the statute, merely because it provides that "it shall be unlawful ..." cannot be viewed as a wholly penal statute. Its violation can have civil consequences in civil suits such as mortgage forfeiture, as held by the court in *Chemical Bank N.Y. Trust Co. v. Steamship Westhampton,* 358 F.2d at 574. Furthermore, while the court in *The Antelope,* 23 U.S. (10 Wheat.) 66, 6 L.Ed. 268 (1825) said, in *obiter dicta,* that penal statutes do not apply extraterritorially, Daewoo was mistaken in arguing at the hearing that all statutes to which criminal

penalties attach are not extraterritorial in scope. For example, the antitrust laws and the securities laws, both having criminal penalities, apply extraterritorially in a civil context. *See Bersch,* 519 F.2d at 985; *Leasco,* 468 F.2d at 1339–40; *Schoenbaum,* 405 F.2d at 207–08; *United States v. Watchmakers of Switzerland Information Center,* 1963 Trade Cas. (CCH) ¶ 70,-600 (S.D.N.Y.1963). As held by Judge Learned Hand in *United States v. Aluminum Co. of America,* 148 F.2d at 444, in upholding jurisdiction under the antitrust laws over extraterritorial agreements restraining U.S. trade, "[b]oth agreements would clearly have been unlawful, had they been made within the United States, and it follows from what we have just said that both were unlawful, though made abroad, if they intended to affect imports and did affect them."

Moreover, Daewoo misstates the premise which it argues. That a statute can be characterized as penal is not, in more modern analysis, of great significance in determining whether the statute applies extraterritorially. With respect to effects on a vessel flying the flag of a state asserting extraterritorial jurisdiction, Hudson, *The Sixth Year of the Permanent Court of International Justice,* 22 American Journal of International Law 1 (1928) observed:

criminal [does not] differ from civil jurisdiction in this respect. Many states take cognizance of offenses committed abroad; "the territoriality of criminal law; therefore, is not an absolute principal of international law and by no means coincides with territorial sovereignty." ... No rule of international law forbids [a state] to take into consideration the fact that the offense produced an effect on a vessel [of that state] "and consequently in a place assimilated to [the state's] territory in which the application of [the state's] criminal law cannot be challenged."

*Id.* at 11 (quoting from *The Case of the S.S. "Lotus" (Government of the French Republic v. Government of the Turkish Republic),* 1927 P.C.I.J., ser. A., No. 10 (Judgment of September 7, 1927). Even

without regard to ships, illustrations numbers 1, 2 and 3 to Section 18 and illustration number 1 to Section 30 of the *Restatement* demonstrate that the rules of those sections generally apply to both criminal and civil laws. Consequently, to apply Section 9 extraterritorially, to the extent concluded above, accords with international law.

## IV.

■ It is in light of the evident congressional intention that sales of U.S.-flag vessels in foreign courts be prevented as much as possible that we consider the first of the two principal issues before us: whether Congress, had it thought of the issue, would have required that bankruptcy court orders granting relief from the automatic stay comply with Section 9 to the greatest extent possible.

Section 362(d) of the Bankruptcy Code provides that the court shall grant such relief (a) if cause, including a lack of adequate protection, is shown, or (b) if, with respect to a stay of an act against property, the debtor lacks equity in the property and the property is not necessary for an effective reorganization. 11 U.S.C. § 362(d).

But the terms of § 362(d) must be read in conjunction with other statutes and in light of other concerns. Congress could not have intended that the bankruptcy courts ignore other statutes. Rather, courts are to interpret applicable statutes together; they are to give effect to both statutes involved, to the extent possible, unless Congress clearly indicated an intention that one apply over the other or that the two statutes cannot co-exist. *E.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1020, 104 S.Ct. 2862, 2881–82, 81 L.Ed.2d 815 (1984).

Here there is no such indication, and the two statutes can co-exist. Although it is all too apparent that Congress gave no express consideration to the interplay of § 362(d) and Section 9, the language of § 362(d) itself affords ample warrant for attaching a condition. It does not require vacature or termination in all instances; it

speaks instead of granting relief from the stay "such as by terminating, annulling, modifying or conditioning such stay...." What MarAd seeks here is that the Court not terminate the stay but only modify it to permit foreclosure sales to entities within the scope of Section 9.

It is apparent that in crafting the Bankruptcy Code in 1978, Congress gave little if any thought to the interplay of bankruptcy and admiralty concerns in the context of a reorganization of an international shipping company. Only in 1986 by adding § 362(b)(12) and (13), did Congress even begin to address governmental admiralty issues in a bankruptcy context. Even in that endeavor to redress budgetary concerns arising from MarAd's increasing debt by affording MarAd relief from the automatic stay, Congress acted in a confusing manner, leaving the courts to determine the meaning of what it did in light of its intention. *See In re Prudential Lines, Inc.,* 69 B.R. 439, 15 B.C.D. 445, 16 C.B. C.2d 383, Bankr. L.Rep. (CCH) ¶ 71,676 (Bankr.S.D.N.Y.1987).

It is also apparent, as the creditors committee argues, that Congress did not envision that motions for relief from the automatic stay would devolve into a full-blown determination of tangential issues such as counterclaims. These issues can usually be readily resolved at another time and would only delay the granting of relief if undertaken along with the motion for relief. *See In re Compass Van & Storage Corp.,* 61 B.R. 230, 234 (Bankr.E.D.N.Y.1986); *In re Dennison,* 50 B.R. 950 (Bankr.E.D.Pa. 1985); *In re Davenport,* 34 B.R. 463 (Bankr. M.D. Fla.1983); *Lincoln Bank v. High Sky, Inc. (In re High Sky, Inc.),* 15 B.R. 332, 4 C.B.C.2d 1290 (Bankr.M.D.Pa. 1981).

That observation, however, is of little significance in assessing what Congress would have done had it thought of the issue before us. A requirement of compliance with Section 9 to the greatest extent possible requires no prolonged hearing. Consideration of the issue on a motion under § 362(d) would thus be akin to entertaining "the presentation of evidence as to

the existence of [counter] claims which the court may consider in exercising its discretion [under § 362(d)]." S.Rep. No. 989, 95th Cong., 2d Sess. 55 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5841; *accord Compass Van & Storage,* 61 B.R. at 234; *High Sky,* 15 B.R. at 337–38.

Apparently recognizing this, the Banks contend that the question of compliance with Section 9 ought to be left to the determination of the courts where the foreclosure occurs. With respect to admiralty proceedings in U.S. district courts, it would be superfluous for Congress to have conditioned compliance with Section 9 as part of § 362(d). As noted, 46 U.S.C. § 961(f) affords sufficient protection in U.S. district courts.

The same type of protection, however, cannot be guaranteed in foreign admiralty court proceedings. On this motion it is claimed that the Singapore and Hong Kong courts will not afford comity to Section 9 beyond the brief statement by the Singapore court that it would consider doing so if the bid by a foreign entity were only marginally greater than that of a U.S. entity. Foreign admiralty proceedings involving vessels of a bankruptcy estate are thus unlike motions seeking relief from the automatic stay where the issues of compliance with non-bankruptcy law—*e.g.,* state law notice provisions applicable to foreclosure proceedings, state law concepts of commercial reasonableness under § 9–504 of the Uniform Commercial Code, U.C.C. § 9–504 (1977) and of continued compliance with state and federal environmental constraints—are left to courts that will apply such laws. Even though they apparently did so in the past, here it is not at all certain that the Singapore and Hong Kong courts will recognize and give effect to Section 9. Indeed, on this motion it is claimed that those courts will not apply Section 9. Thus, given Congress's concern for enforcement of Section 9, it appears that had it considered the issue, it would have required the bankruptcy courts, in granting relief from the automatic stay, to modify the stay but compel compliance with Section 9 to the extent possible and at least to require U.S. trustee-mortgagees to request foreign courts in foreign arrest proceedings to recognize and give effect to the prohibitions of Section 9.

Such a conclusion is supported further by the Ship Mortgage Act, 46 U.S.C. § 961(f), and its prohibition of district courts' admiralty sales of U.S.-flag vessels to foreigners. The bankruptcy courts sit as adjuncts to district courts. *E.g., In re Lion Capital Group,* 46 B.R. 850, 859, 12 B.C.D. 840, 12 C.B.C.2d 59 (Bankr.S.D.N.Y. 1985). To be sure, 46 U.S.C. § 961(f) refers to district courts sitting in admiralty. It nonetheless lends strong support to the notions that Congress did not intend the courts of this country to defeat the policy of Section 9 and that, had Congress thought about the issue, it would have engrafted a similar prohibition onto § 363 of the Bankruptcy Code, concerning the sale and lease of estate property, and added to § 362(d) a requirement that comity be sought in foreign courts if the bankruptcy court modifies the automatic stay to permit foreclosure.

## V.

Holding that the automatic stay only be modified to permit sale of the Econships consistent with Section 9 is particularly appropriate in the circumstances of this case: post-petition foreign arrest proceedings commenced by foreign creditors in violation of the automatic stay, and the commencement of additional arrest proceedings by the Banks' Singapore and Hong Kong counsel despite the limited scope of this Court's prior orders which modified the automatic stay to permit the Banks to act only in connection with ongoing foreign arrest proceedings.

The automatic stay applies extraterritorially. *United States Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Industries, Inc.),* 68 B.R. 690, 694, 15 B.C.D. 703 (Bankr.S.D.N.Y.1986). Section 362(a) of the Bankruptcy Code bars, *inter alia,* all acts by creditors to collect pre-petition debts, acts to obtain possession of or control over property of the estate, and acts to create, enforce or perfect a lien on property

of the estate. 11 U.S.C. § 362(a)(1), (3), (4). The proceedings in Singapore and Hong Kong come within the scope of § 362(a). *GAC Marine Fuels Ltd.*, 68 B.R. at 694. That the proceedings have not abated is due to (i) the contemptuous conduct of those who commenced them or caveated or intervened in those actions without an order of this Court modifying the automatic stay, (ii) the apparent inability to obtain *in personam* jurisdiction with respect to some of those creditors, (iii) the continued maintenance of those actions before the Singapore and Hong Kong courts notwithstanding the provisions of § 362(a), and (iv) the prosecution by Citibank counsel of the *in rem* action and arrest against the AMERICAN NEW YORK, after termination of the original arrest proceeding pertaining to that vessel.

Violation by foreign creditors of United States law, namely § 362(a), in arresting vessels abroad, is no warrant for not enforcing Section 9. The military and commercial needs of the United States are not to be minimized because foreign creditors have violated United States law. While those violations would be of less concern if the Singapore and Hong Kong courts ultimately recognize and give full effect to Section 9, one would think that both courts would grant comity to United States law, i.e., both Section 9 and the automatic stay codified in Section 362(a), in a fashion similar to the comity that United States courts would grant to foreign bankruptcy statutes and proceedings, including those of Singapore and Hong Kong, and vacate all four arrests. *See Cunard Steamship Company Ltd. v. Salen Reefer Services A.B.*, 773 F.2d 452 (2d Cir.1985).

Nor are the military and commercial interests of the United States to be minimized because of the acts taken by the Banks' counsel in Singapore and Hong Kong beyond that permitted by orders of this Court.

The Banks apparently recognize the sharp limitations contained in this Court's prior orders modifying the stay with respect to the arrest proceedings in Singapore and Hong Kong. In arguing for unconditional relief, the Banks (i) contend that the question of enforcing Section 9 should be left to admiralty courts, (ii) note that § 365(f) permits assignments of assumed executory contracts and leases notwithstanding nonbankruptcy law, and (iii) in a footnote, minimize the military need and usefulness of the Econships. The debtor and the creditors committee principally assert, in addition to the assertions already addressed, that the estate will be harmed by not receiving the cash and release of administrative claims premised by the settlement. They add that restricting the class of buyers to U.S. entities will lower the sales price of the four Econships, thus harming not only the Banks and other Econship mortgagees, but also all unsecured creditors as a result of the Banks increased deficiency claims.

The first of the Banks' contentions is drawn from this Court's opinion in *In re Prudential Lines, Inc.* There it was held, *inter alia*, that issues of validity and ranking of maritime liens fell within the expertise of the admiralty courts and should generally be left to them upon the end of the ninety-day stay of MarAd foreclosure actions provided in 11 U.S.C. § 362(b)(12). 69 B.R. at 449–51. The applicability of Section 9, however, does not present a question involving such specialization. Statutory interpretation lies within the general competence of courts. Moreover, the admiralty courts to which the issue in this case is sought to be consigned are not courts of the nation whose law is to be interpreted. While it is to be hoped that the Singapore and Hong Kong courts will ultimately recognize and give effect to both § 362 and Section 9, the interpretation of a statute is best left to the courts of the enacting state.

As to § 365(f), no assignment of a charter or other executory contract is involved here. Furthermore, the intention of § 365(f) is clearly to facilitate congressional policy favoring the assignability of contracts and leases regardless of the enforceability in state law of nonassignability clauses; § 365(f) does not permit assignments in violation of a specific federal statute or statutory policy precluding assign-

ment. *E.g., In re Nitec Paper Corp.,* 43 B.R. 492, 11 C.B.C.2d 959 (S.D.N.Y.1984).

Also lacking in substance is the Banks' brief challenge to MarAd's determination that the Econships are "essential for the national security interests of the United States, in line with previous advice received from the United States Navy, because of the very large Sealift capacity of these vessels which i[s] very useful for supplying troops, and the fact that the vessels may be requisitioned by the U.S. government in time of war." (Affidavit of Robert J. Patton, Jr. at 5). There is no question that the courts of this country are not to "distort the Constitution to approve all that the military may deem expedient." *Korematsu v. United States,* 323 U.S. 214, 244, 65 S.Ct. 193, 207, 89 L.Ed.2d 194 (1944) (Jackson, J., dissenting). Courts do, however, give "deference to the professional judgment of military authorities ..." *Goldman v. Weinberger,* 475 U.S. 503, ——, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478, 484 (1986).

In this case neither is a constitutional issue present nor have military authorities made a professional judgment with respect to the Econships. But the Executive branch of the United States has made such a judgment "in line with" prior advice received from the military. The matters concern U.S.-flag vessels over which Congress, in Section 9, empowered the Executive branch to make that judgment. Discretion can be abused and courts might be able to review it under that standard. *See* 5 U.S.C. § 706 (1982). Here, even assuming that this Court could review such, there is no evidence of abuse. The Econships are exceptionally large; they could be used to supply overseas troops and they relate to a military purpose.

More meritorious are the claims that the estate should be maximized by the settlement, and that the harm to the Banks and other creditors should be contained by removing the Banks' administrative claims and by achieving a presumably higher sales price by opening the bidding to non-U.S. purchasers. This position has appeal. Maximizing estates and providing creditors with a dividend in liquidation are central to

bankruptcy policy. But the fact remains that Section 9 concerns the furtherance of a policy of national importance. The welfare of a particular entity and creditors' expectations regarding a dividend in a particular bankruptcy case are accommodated by receiving the permission of the bankruptcy courts to foreclose or sell U.S.-flag vessels consistent with that policy.

Furthermore, in this particular case where the four vessels would not have been initially arrested abroad and would have been returned to U.S. ports like the other eight Econships had the automatic stay provided by 11 U.S.C. § 362(a) been complied with, there is no warrant for not enforcing Section 9. Even were it to be said that Congress would have left the enforceability of Section 9 to the Court's discretion, *cf.* S.Rep. No. 989, *supra,* at 55, rather than have required compliance with it to the extent possible as we hold above, failure to require such compliance with Section 9 in the circumstances of this case would, in our judgment, be an abuse of discretion. Simply put, had there been no violation of § 362(a), the Banks would be seeking to foreclose on these four vessels in United States district courts, and sale to American entities would be required under 46 U.S.C. § 961(f). If a higher price is to be received by sales to non-Americans, it could benefit those who violated § 362(a) in the first place and also the Banks who, wittingly or unwittingly, exceeded the limitations of this Court's orders. In any event, excusing that lack of compliance by not tailoring an order for relief in a fashion consistent with Section 9 expectations would only invite further noncompliance in the future to the detriment of all debtors and their creditors and also to the detriment of the policies sought to be achieved by Section 9.

With the condition of unconditional vacature of the automatic stay, the settlement cannot be approved.

SETTLE ORDER.